385 So.2d 951 (1980)
Tillman WADFORD
v.
STATE of Mississippi.
No. 51816.
Supreme Court of Mississippi.
July 9, 1980.
*952 Montgomery, Smith-Vaniz & Stater, C.R. Montgomery, Don McGraw, Burke C. Murphy, Jr., Canton, for appellant.
Bill Allain, Atty. Gen. by Frankie Walton White, Sp. Asst. Atty. Gen., Jackson, James W. Smith, Pearl, for appellee.
En Banc.
SMITH, Presiding Justice, for the Court.
Tillman Wadford was indicted for the murder of one Greg Coghlan. He was tried on that charge in the Circuit Court of Madison County, found guilty, and sentenced to life imprisonment.
On appeal, it is argued that the evidence was insufficient to support the conviction. The assignments dealing with this question are without merit. Several eyewitnesses testified that Wadford drew a pistol from his back pocket, pointed it at Coghlan and shot Coghlan in the head, killing him, at a time when Wadford was not in imminent danger, real or apparent, of suffering death or great bodily harm at the hands of Coghlan.
In Redwine v. State, 149 Miss. 741, 115 So. 889 (1928), the rule was stated:
In determining the propriety of the action of the trial court in refusing to direct a verdict of not guilty in this case, the evidence tending to prove appellant's *953 guilt must be considered most favorably for the state. Putting it differently, every material fact proven, either directly or by reasonable inference, tending to show appellant's guilt, must be taken as true. (Emphasis added).
See also Glass v. State, 278 So.2d 384 (Miss. 1973).
It is undisputed that at the time he was killed by Wadford, Coghlan was unarmed. In the statement of facts in Wadford's brief it is said, "The defendant, Wadford, contended that the shooting was accidental." Wadford's testimony at his trial makes it clear that this was a correct statement of Wadford's defense.
The homicide took place immediately outside the door of "Club 43".
Wadford, testifying as a witness in his own behalf, gave his version of the homicide, in the course of which he undertook to describe in detail the facts and circumstances.
According to Wadford's testimony, as he and his wife and his wife's sister walked out of the club door, Coghlan, who was standing outside with one or two others, addressed a vulgar sex proposition to the women. Wadford told Coghlan to "watch his damn mouth." After the Wadford party had exited the club, it was decided that Wadford would go back in and tell "Junior" that they were leaving so that the latter would not be worried about them. The women preceded Wadford into the club and the "boys" (one of whom was Coghlan) again made the indecent proposal. Wadford reminded them that he had told them to "watch their mouth" and that the women were his wife and sister-in-law. Wadford said he told "them that if they wanted to fight that it would be fine with him." At that point, Coghlan told Wadford that he, Coghlan, would whip his "damn ass" and Wadford said that he had responded that Coghlan would not. According to Wadford, Coghlan said he had "something" that would take care of Wadford and Wadford "backed up." Wadford then left, went to his truck and armed himself with a pistol. He put the pistol in his back pocket.
Wadford said he did this for his protection and because the women were in the club and would have to pass Coghlan and the others when they came out. Having obtained his pistol, Wadford returned and "that's when they started and had a hold of me. I pulled the gun to shoot in the air but the gun didn't make it all the way up and shot him in the eye. I did not intend to kill the boy." Wadford said that at no time during the evening did he have any intention at all of killing Greg Coghlan. He said that, when he drew the pistol, "some of them had their hands on me and there was kind of a scuffle." Greg was rushing in as he, Wadford, was bringing up the gun to shoot in the air. Wadford continued, "I got my hand into my back pocket and pulled it (the pistol) out to shoot it in the air and the gun went off." He said that he had the intention of shooting up in the air and scaring "them" off; that when he pulled the gun Coghlan was coming in front of him and the others were to the sides. He said that the gun didn't made it up into the air because "they" had my arm. "I had my finger on the trigger and it (his arm) hit the man that I had been talking to." Wadford said that it had been he who had suggested the fight after Coghlan had made the remark to the two women.
After giving the above testimony in support of his defense of "accident", Wadford concluded his testimony on cross-examination as follows:
I pulled that gun and shot him in self-defense under the statement that he said he had something to take care of me, and that was in my mind, protecting myself at the time.
Q. But you never saw a thing?
A. Never saw a thing?
Q. Never saw a weapon of any kind?
A. No, sir.
This leads to Wadford's final assignment of error. Wadford contends that the trial court's action in refusing to grant a certain instruction requested by Wadford, that would have allowed the jury to find the homicide justified as having been committed in necessary self defense, was error.
*954 Wadford's testimony was directed specifically and in detail to establishing that the shooting had been unintentional and accidental. It is asserted in his brief that his defense was accidental slaying. This cannot be reconciled with a view that Wadford's act in shooting Coghlan had been purposeful and done because there was a reasonable apprehension on Wadford's part that it was necessary to do so in order to protect himself from grave bodily injury or death at Coghlan's hands, the danger thereof being imminent and impending, and that shooting Coghlan had been necessary to prevent it.
Wadford said that when he drew his gun, he had his finger on the trigger intending to shoot in the air. At the time, he said, Coghlan was two or three feet away from him, coming toward him. When Wadford failed to get the gun up and "the gun went off" Wadford's own testimony not only wholly failed to support the theory that he acted in necessary self defense but negates it in detail. Consequently, he was not entitled to an instruction submitting the theory of self defense to the jury. An instruction should not be given to a jury submitting a theory which is not supported by the evidence.
Wadford's requested instruction, which would have submitted to the jury a theory of self defense falls squarely within the rule stated in Pittman v. State, 297 So.2d 888, 893 (Miss. 1974). "Instructions should be given only if they are applicable to the facts developed in the case being tried."
Wadford's concluding statement on cross examination that he had "shot him in self defense", while in itself incapable of creating a factual issue for the jury, made it necessary and proper for the state to request an instruction which was granted, setting out the circumstances which must be established by evidence to justify a homicide on the ground of self defense. This is not to suggest that, where a defendant is, on facts in evidence, entitled to a self defense instruction, the State may preempt the subject and cut him off by obtaining an instruction of its own setting forth the essential elements of that defense. The argument is now made that the State's instruction should not have been given because it was "abstract". It does not use the names of the parties. However, it is undisputed that there was only one "slayer", Wadford, and only one "deceased", Coghlan, and no apprehension of confusion could reasonably have been entertained on that account.
As pointed out previously, in the opening portion of the brief filed on behalf of Wadford, it was asserted that Wadford's defense was that the shooting had been accidental. In addition to Wadford's own testimony, other witnesses testified that Wadford had told them that he had intended to shoot in the air and had no intention of shooting Coghlan and that the homicide had been an accident.
The instruction requested by Wadford, which the trial judge declined to grant, was as follows:
The Court instructs the jury that the Defendant, Tillman Wadford, asserts that the killing of Greg Coghlan was a justifiable homicide because the Defendant's act which caused the death of Greg Coghlan was committed by Tillman Wadford in the lawful defense of his own person where there was reasonable ground to apprehend a great personal injury and there was eminent danger of such design being accomplished. The killing of a human being is justified if the Defendant was acting in self defense because he had reasonable grounds to fear that Greg Coghlan would attempt to kill the Defendant or cause great bodily harm to the Defendant and that there was eminent danger of the injury occuring. If you find that a homicide is justifiable, it is not necessary that you believe that Tillman Wadford had no ill will or malice toward Greg Coghlan. (Emphasis added).
It is conceivable that there may be cases in which the defenses of accident and self defense are compatible and may be asserted together. However, in this case the facts related by Wadford are irreconcilably inconsistent with any view that Wadford had intentionally shot Coghlan at a time when *955 he, Wadford, had any reasonable ground to apprehend grave personal injury or death at the hands of Coghlan.
The first sentence of the requested instruction is clearly misleading. This would have made it appear to the jury that the court was informing the jury that Wadford had testified (asserted) that Wadford's act in killing Coghlan had been committed by Wadford in the lawful defense of his own person at a time when there was reasonable ground to apprehend imminent danger of death or great personal injury at Coghlan's hands. This would have been incorrect as Wadford had not so testified. Moreover, while it begins by including in the fears to be apprehended by Wadford the fear of "death," it continues by stating that the killing was justified if "there was reasonable ground to apprehend a great personal injury." There is no requirement whatever in the instruction that, in order to sustain the theory of self defense, it was necessary that the jury find these facts from evidence.
Self defense is a legal concept which must be supported by evidence to be available to a defendant in a homicide case. The mere statement by a defendant that he killed his victim in "self defense" is wholly incapable by itself of raising a factual question requiring its submission to the jury. The plea of self defense must be supported by evidence of facts and circumstances from which the jury may conclude that a defendant was justified in having committed the homicide because he was, or had reasonable grounds to believe that he was, in imminent danger of suffering death or great bodily harm at the hands of the person killed. No such evidence appears in Wadford's testimony or elsewhere in the record, notwithstanding the fact that he concluded his cross examination by saying he killed Coghlan in "self defense."
The requested instruction would have put the court in the position of telling the jury that "Wadford asserts that the killing of Greg Coghlan was justifiable homicide because the defendant's act which caused the death of Greg Coghlan was committed by Tillman Wadford in the lawful defense of his own person where there was reasonable ground to apprehend a grave personal injury and there was imminent danger of such design being accomplished," when such was not the case.
This would not have been a correct statement. Wadford's defense, as stated in his brief, and outlined in his testimony, was that the homicide had been accidental. Wadford's own version of the killing was that he had unintentionally shot Coghlan and that the killing had been an accident. The legal concept of self defense in a homicide case is based upon justification of a purposeful killing because it was necessary to kill in order to save the killer from imminent danger of suffering death or grave bodily harm at the hands of the person killed. There was no evidence in this case capable of supporting a factual finding that Wadford had killed Coghlan under such circumstances. The court correctly declined to grant Wadford's requested instruction.
It is interesting to note that the State requested and was granted an instruction submitting to the jury the question of whether the homicide had been manslaughter. This was properly based upon the nature of Wadford's defense that he had drawn the gun intending to fire it in the air and that it had fired accidentally.
In support of his contention that the trial judge committed prejudicial error in declining to grant his requested instruction on self defense appellant cites Gandy v. State, 355 So.2d 1096 (Miss. 1978), a culpable negligence case. The rule followed in Gandy is sound but it has no application to the facts in the present case. Also cited is Gambrell v. State, 92 Miss. 728, 46 So. 138 (1908), a case in which this Court refers to a general rule that where there is serious doubt in the law as to whether or not certain proof is permissible or a requested instruction should be given, ordinarily the doubt should be resolved in favor of the accused. The case now under consideration does not fulfill the requirements for application of the rule.
*956 Other matters assigned as prejudicial error have been examined and carefully considered and are found to be without merit. The judgment appealed from is affirmed.
AFFIRMED.
PATTERSON, C.J., ROBERTSON, P.J., and SUGG, BROOM, LEE and COFER, JJ., concur.
PATTERSON, C.J., and LEE, J., specially concur.
BOWLING and WALKER, JJ., dissent.
PATTERSON, Chief Justice, specially concurring:
The facts of this unfortunate homicide are amply stated in the majority and dissenting opinions, needing no clarification.
The cardinal issue before the court as developed by the majority and dissenting opinions is whether the defendant was entitled to an instruction on self-defense. I think this is not the issue because the jury was instructed on self-defense. Probably this needs some explanation.
The defendant argued that he accidentally killed Greg Coghlan, his assailant, while indulging the right of self-defense which was thrust upon him by the imminent likelihood of great bodily injury or death at the hands of Coghlan. In this unusual circumstance, I am of the opinion there is no present inconsistency between the plea of self-defense and the assertion of death by accident, but if there be an inconsistency between the two, it was resolved in the defendant's favor because, as mentioned, the jury was instructed on self-defense as will be later shown.
It is of course true that an act in self-defense is intentional and responsive to urgent circumstances for one's own safety. It is also true that an intentional course of action is inconsistent with a course of events initiated by an accident. But this is not to state that an intentional act cannot go awry because of an unforeseen accident. In either event, I am of the opinion the action of Coghlan and his associates immediately prior to Wadford's firing the pistol would determine whether or not he was entitled to a self-defense instruction. I think the existence of the right of self-defense and not the manner in which it was carried out is the point. For this reason I do not concur in the majority opinion in its theory of inconsistency between a plea of self-defense and accident.
Neither is it my opinion, as stated in the dissent, that an act of self-defense mandates the killing of an aggressor. Surely, there are situations where the right of self-defense could be exercised by non-fatal means to the aggressor to avoid serious injury or death.
I am of the opinion, although it is academic, that the defendant was entitled to an instruction of self-defense because of the critical circumstances immediately prior to the fatal shot. In Craft v. State, 271 So.2d 735 (Miss. 1973), a case concerning self-defense instructions, we stated:
It is a rare case indeed, and this is not one of them, in which it is proper to give an instruction to the jury cutting off the right of a defendant in a murder prosecution to defend himself. Under the facts in evidence the giving of either of the quoted instructions was fatally prejudicial and requires reversal of the conviction and a remand of the case for a new trial... . (271 So.2d at 736)
This is not the "rare case" in which the self-defense instruction should have been refused.
The question of who should have obtained the instruction, that is to say, the defendant, the prosecution or the court, is of little significance as long as the jury was properly instructed. The following instructions were given:
INSTRUCTION NO. S-3
The Court instructs the jury that to make a homicide justifiable on the grounds of self-defense, the danger to the slayer must be actual, present and urgent, or the slayer must have reasonable grounds to apprehend a design on the part of the deceased to kill him, or to do *957 him some great bodily harm, and in addition to this, that there must be imminent danger of such design being accomplished; and hence, mere fear, apprehension or belief, however sincerely entertained by one person, that another designs to take his life or to do him some bodily harm, will not justify the former in taking the life of the latter. A party may have apprehension that his life is in danger, and believe the grounds of his apprehension just and reasonable, and yet he acts at his peril. He is not the final judge; the jury may determine the reasonableness of the ground upon which he acted.
INSTRUCTION NO. S-2
The Court instructs the jury that malice aforethought mentioned in the indictment in this case, does not have to exist in the mind of the slayer for any given length of time; and if at the very moment of the fatal shooting of Gregory Coghlan, the defendant, Tillman Wadford, did shoot said Gregory Coghlan with the deliberate design to take the life of Gregory Coghlan, and not in necessary self-defense, real or apparent, then it was as truly malice and the act was as truly murder as if the deliberate design had existed in the mind of the defendant for minutes, hours, days, weeks or even years.
INSTRUCTION NO. S-4
The Court instructs the jury that manslaughter by use of a deadly weapon, is the killing of a human being without malice, in the heat of passion, without authority of law and not in necessary self-defense; and if the jury believes from the evidence in this case beyond a reasonable doubt that the defendant, Tillman Wadford, so killed Gregory Coghlan, then you will find the defendant, Tillman Wadford, guilty of manslaughter.
INSTRUCTION NO. D-3
The Court instructs the jury that the killing of a human being is excusable homicide if you find from the evidence, if any, that the Defendant Tillman Wadford's act which caused the death of Greg Coghlan was the result of an accident and misfortune, in the heat of passion, upon sudden and sufficient provocation, and if you further find that Greg Coghlan's death was caused by an accident resulting from someone hitting Tillman Wadford's arm as he attempted to shoot his gun up into the air, then the homicide is excusable (emphasis supplied).
I am of the opinion these instructions when read together properly apprised the jury of each defense the defendant asserted. If they erred, such inured in the defendant's favor, leaving his present contentions without merit.
Moreover, the argument advanced upon the abstractness of the instruction does not constitute reversible error per se. Scales v. State, 289 So.2d 905, 908 (Miss. 1974); Gilmer v. State, 271 So.2d 738, 740 (Miss. 1973); and of course all instructions must be read together to determine their overall correctness. Shields v. State, 244 Miss. 543, 144 So.2d 786 (1972). In reading these instructions together we are impressed with the opening instruction of the court to the jury which admonished it in no uncertain terms to base its verdict upon the evidence that it had heard and in accord with further instructions of the court. If any of the cited instructions be abstract, then it is my opinion this was cured by the court's instructions and has application because they must be read together.
I concur in the result of the majority opinion, but not in its reasoning. Overall, the evidence amply supports the jury verdict of murder. The instructions, which I do not think were erroneous, but if they were, erred in the defendant's favor. I would affirm.
LEE, J., joins in this opinion.
LEE, Justice, specially concurring:
I concur in the result of the majority opinion. I think the requested instruction *958 on self-defense was erroneous as drawn and was correctly refused. I join the specially concurring opinion of Chief Justice Patterson.
BOWLING, Justice, dissenting:
I respectfully dissent. In the first place, the majority opinion establishes the most unique and novel legal principle this writer can imagine  that is, if a person being attacked does not intend to kill his attacker, whatever acts he does to attempt to repel his attacker cannot be self defense. He has got to say that "I tried to kill him." The majority mandates a killing rather than other evasive actions short of a homicide. I cannot accept this principle.
The impression is left in the majority opinion that the appellant in whatever he did was dealing with two or three "boys." This is not correct. He was dealing with at least five grown persons, each of whom admittedly was intoxicated. The ages of three of those confronting appellant, as shown by the record, were 35, 34 and 22. The age of the deceased is not revealed in the record. At least two of the survivors of the gang had a prior criminal record. In addition, the deceased admittedly had shot his father, but the disposition of that action is not shown in the record. These were the "boys" implied by the majority opinion to have been harassed by appellant.
Rather than speculate on what the record shows to be appellant's testimony regarding his version of what he did when confronted with the above described individuals, I necessarily will have to lengthen this opinion by actual quotes from the record. Appellant testified about the admitted vulgar and vile language of the deceased while surrounded by his friends at the doorway of the building that appellant, his eight-month pregnant wife and his sister-in-law were entering. The language itself was sufficient to upset any person with respect for himself and his family. Appellant's testimony was that after realizing the situation he was faced with he placed the pistol in his pocket for protection in the event the situation got out of hand.
The following are direct excerpts from the record under which appellant's attorney requested the instruction on self defense:
A. Well, we had been to a fish fry down at the John Deere place and we got through cooking there and we decided to ride out to the 43 Club, me and my brother, to dance and have a beer, so we proceeded on out there. Later, Peggy and Dorothy Sue came in and I walked up to them and asked them was they ready to go, and they said "yeah." We walked out the door, I don't know where they heard it or not, but I heard it, the boy asked them did they want to fuck and I told him, I said, "Man, watch your damn mouth." So we went on out and I told Dorothy, I'm going back in and tell Junior that we are leaving where he wouldn't worry about us. So Dorothy and them walked in ahead of me, and I locked my pickup and I was right behind them, and they asked them did they want to fuck again. That's when I turned around and told Craig, I said, "I've asked y'all to watch your mouth," I said, "That's my wife and my sister-in-law," and I also told 'em if they wanted to fight that was good with me. That's when Craig made the statement that "We will whip your damn ass." I said, "No, you will not." And then he made the statement that he had something that would take care of me. So I backed off on them, I understand my wife and sister-in-law had went inside. They had to come back out. I had to go back in to get 'em to come out, so that's when I unlocked my truck and put my gun in my pocket going under my protection. I knew I had to go in and get them and I had to come out.
Q. Okay.
A. And when I walked up to the door is when all of them started, they had aholt of me, I pulled the gun to shoot in the air, I did not intend to kill the boy. The gun didn't make it all the way up and caught him in the eye.
Q. Okay, Mr. Wadford, at the time you pulled the pistol and everything, could you describe how close the four people were to you?
A. They were right on me.
*959 Q. Were they within reaching distance?
A. Yes, sir.

.....
Q. What, if anything, did you know of the individuals with reference to whether or not they were carrying weapons or had access to weapons?
A. Well, sir, when he told me he had something to take care of me I figured he had something.

.....
Q. Any statement with reference to your wife or your sister-in-law?
A. Only that they asked them did they want to fuck.

.....
Q. At any time during the course of the evening, just tell the jury what was in your mind at the time you drew that pistol?
A. It was in my mind, if they was intending to hurt me or kill me one, after he had made the statement he had a gun, he didn't say he had a gun but he had something to take care of me, that it was in my attention that they had in their mind either hurting me or killing me.
Q. At the time you drew that pistol, do you recall if any of the four gentlemen had their hand on you?
A. It was a scuffle.
Q. Okay, where did, ah, were the four people right there with you?
A. Yes, sir.
Q. What if anything were they doing to you?
A. They had a holt of me. Greg rushed in as I was bringing the gun up, I was going to shoot in the air.

.....
Q. They had what?
A. They had done humiliated my wife and stuff by asking them that.
Q. I see. And you felt that was justification at that point, is that right?
A. No, sir, I didn't feel that that was justification but when he threatened that he had something to take care of me, then I figured in myself that I had the right to protect myself.
Q. You positive he said that?
A. Yes, sir.

.....
Q. That's why you said that, is that right?
A. It is, he said he had something to take care of me.

.....
Q. Okay. And did any of the other three ever say anything directly to you?
A. No, sir.
Q. They never threatened you?
A. They grabbed me.
Q. They grabbed you? All three of them?
A. They had a holt of me.
Q. Where did they have you?
A. Well, one on the other arm.
Q. Who had you on which arm?
A. I don't know the people.

.....
Q. Do you know which one had you where?
A. No, sir.
Q. They just all grabbed you?
A. Yes, sir.

.....
Q. All right. Now, you're standing there and all four of them rushed you and grabbed you?
A. Right.
Q. Now one of them had one arm, is that right?
A. Well, yes, sir, they had aholt of me.
Q. Where did the other two have you?
A. I don't know sir, it was just hands and bodies on me is all I know.
Q. They were just on you?
A. Yes, sir.
Q. All three of them had you wrapped up?
A. Well, I didn't have time to think to stop and count 'em, no, sir.

.....
*960 Q... . You managed to get your hand in your back pocket and get the gun out and you were going to shoot up in the air?
A. Right.
Q. Why didn't you just start swinging?
A. Well, I had in my mind, he had done said he had something to take care of me 
Q. You hadn't 
A.  I did not know what they had, I didn't have time to look 
Q. And you hadn't seen a thing, had you?
A. I didn't have time to look.
Q. You hadn't seen a thing, had you?
A. I didn't have time to look, sir.

.....
Q. How long does it take to take a swing as compared to reaching for a pistol in your back pocket when three people got you surrounded?
A. Well, he had done told me he had something to take care of me. I didn't know what they had.

.....
Q. All right. Now where was Greg Coghlan when you pulled the gun?
A. He was coming in front of me.
Q. And the other three were holding you?
A. They were on my sides, they had a holt of me.
Q. All right, and you got the gun up in the air?
A. It didn't make it up, sir, they had my arm and it didn't make it up.
Q. They had your arm?
A. Right, yes, sir. It didn't make it all the way up but 

.....
Q. How many people had your arm?
A. I don't know, sir.
Q. You don't know? Might have been all three of 'em?
A. Might have been.
As hereinbefore stated, the majority opinion is to the effect that under the circumstances set out above, appellant would have had to state that he intended to kill the deceased before being entitled to a self-defense instruction. Even the State recognized that such an instruction was proper as it requested one in abstract form. The reason the court did not grant appellant's proposed instruction on this defense was that it had already granted an abstract self-defense instruction requested by the State, which instruction in no way tied in the defense with the evidence as hereinbefore related. The majority opinion criticizes the instruction submitted by appellant and states that the language was erroneous. As stated above, this was not the reason the instruction was refused. If the lower court had recognized appellant's right to an instruction on his defense, it could have been amended prior to final approval.
Whether the jury would have agreed or not, the appellant, under our system, when he is on trial for his life, is entitled to present his defense to the jury. Craft v. State, 271 So.2d 735 (Miss. 1973); Coleman v. State, 179 Miss. 661, 176 So. 714 (1937). I am not passing on appellant's guilt or innocence, but am merely stating that in my opinion he is being denied the right to present his defense. The majority opinion holds that appellant was not entitled to the self-defense instruction even under the admitted situation facing him. In my opinion the error is compounded by the position that appellant  who attempted to avoid killing the deceased rather than shooting him with deliberate design to kill  cannot contend that his actions were taken while trying to defend himself. I cannot accept the legal principle that "self-defense" eliminates all actions other than purposeful killing.
To me there is no way to escape the conclusion that this Court has denied appellant his right to present his case to a jury, fully instructing that jury on appellant's defense. I would reverse and give him a fair trial before a properly instructed jury.
WALKER, J., joins in this opinion.