660 So.2d 1298 (1995)
Larry Darnell CRAIG
v.
STATE of Mississippi.
No. 92-KA-00277-SCT.
Supreme Court of Mississippi.
September 7, 1995.
*1299 Lori T. Burson, Laurel, for appellant.
Michael C. Moore, Attorney General, Jackson, Jeffrey A. Klingfuss, Sp. Asst. Attorney General, Jackson, for appellee.
Before HAWKINS, C.J., and SULLIVAN and McRAE, JJ.
SULLIVAN, Justice, for the Court:
The Washington County Grand Jury, during the July, 1991 term, in vacation, returned an indictment against Larry Craig for the murder of Isaac Hardy. Trial was held and the jury returned a verdict on February 11, 1992, finding him guilty of manslaughter. He was sentenced to serve a term of twenty (20) years in the custody of the MDOC. The trial court denied his motion for a new trial on February 28, 1992.
The confrontation resulting in the death of Isaac Hardy happened on the evening of August 2, 1991, at Fred's Stop and Shop in Mound Bayou, Mississippi. Craig was employed at Fred's, but he testified that he entered the store on that evening only to use the telephone. Gregory Esters testified that earlier in the evening Craig stated, "someone is going to die when [I come] back." Esters said that Craig returned and initiated a scuffle by "pointing his finger" in Hardy's face. Craig, at five feet five inches (5' 5") and approximately 130 pounds, was a significantly smaller man than Hardy.
The two men exchanged words in the store, and, according to Craig, Hardy picked him up by both of his arms and rammed him out the door of the store. Michael Vicks said that Hardy forced the defendant outside and "politely took him out." According to Craig, this included being slammed into a post outside the store. After the fight, Esters noticed that an outside post had been knocked down.
Before Hardy turned to walk back into the store, he apparently made some comment to the effect that Craig was too small to fight. All of the State's witnesses maintained that Craig stabbed Hardy in the back as he attempted to walk back into the store. Craig said that Hardy was merely turned at an angle when he stabbed him. The victim, after being stabbed in the back, spun around only to be stabbed again in the chest by Craig. Isaac Hardy subsequently died of a puncture wound to the left chest.
Craig appeals his conviction asserting two separate, but related, errors regarding jury instructions: (1) the trial court committed reversible error when it granted the prosecution's Instruction S-5 which substantively instructed the jury that the defendant had a duty to flee the victim's attack, and (2) the trial court committed reversible error when it refused to instruct the jury that the defendant had a right to stand his ground without waiving his right to self-defense, as long as he was in a place he had a right to be and was not the provoker or aggressor of the combat.
Instruction S-5, which was submitted to the jury over Craig's objection, reads as follows:
The Court instructs the Jury that a person may not use more force than reasonably appears necessary to save his life or protect himself from great bodily harm. Where a person repels an assault with a deadly weapon, he acts at his own peril and the question of whether he was justified in using the weapon is for determination by a jury.
The Court further instructs the jury that the law tolerates no justification, and accepts no excuse for the destruction of human life, on the plea of self-defense, except that the death of the adversary was necessary, or apparently so, to save his own life, or his person from greatly bodily injury, and there shall be imminent danger of such design being accomplished. The danger to life, or of great personal injury, must be imminent, present at the time of the killing, real or apparent, and so urgent that there is no reasonable mode of escape except to take life. The term "apparent," as in apparent "danger," means such overt, actual demonstration, by conduct and acts of a design to take life, or *1300 do some great personal injury, as would make the killing apparently necessary to self preservation.
One who leaves an altercation, arms himself, and returns with the intent to and does use his weapon on the other party can not claim self-defense.
(emphasis added). Craig claims that the court committed reversible error in granting the above instruction because it improperly instructed the jury that he was under a duty to flee Hardy's aggression. The law of this state allows a defendant to claim self-defense even if the opportunity to flee and avoid the danger existed provided that the appropriate circumstances existed at the time. Haynes v. State, 451 So.2d 227, 229 (Miss. 1984). In Long v. State, 52 Miss. 23, 34 (1876), this Court explained the circumstances under which an individual may stand his ground and still be entitled to claim self-defense:
Flight is a mode of escaping danger to which a party is not bound to resort, so long as he is in a place where he has a right to be, and is neither engaged in an unlawful, nor the provoker of, nor the aggressor in, the combat. In such case he may stand his ground and resist force by force, taking care that his resistance be not disproportioned to the attack.
The State first contends that the granted instruction S-5 did not suggest that Craig had a duty to retreat. We find to the contrary. Before the jury could accept the theory of self-defense, they were required to find that the danger was so urgent that the defendant had no "reasonable mode of escape." This deprived the defendant of the right to claim self-defense if he could have avoided the threat to his safety by escaping. Such an instruction is not supported by the law of this state. This error was not cured by any other self-defense instruction ultimately granted by the trial court as no other instruction touched upon the subject of flight. See Ivey v. State, 154 Miss. 60, 73, 119 So. 507 (1928) (so long as the instructions, taken as a whole, correctly state the law, the error will not require reversal). The trial court erred in submitting Instruction S-5 to the jury, but whether or not the error was reversible is conditioned upon the existence of an evidentiary basis supporting the defendant's right to stand his ground.
Long provides that when a person is (1) in a place he has a right to be, and (2) is not the aggressor, "he may resist force by force, taking care that his resistance be not disproportioned to the attack." Id. at 34. Craig was rightfully in Fred's Stop and Shop, as it was a place of business open to the public. The state, however, strongly maintains that all of the evidence proved that Craig's claimed right to stand his ground during the fight did not exist because he was the provocateur and the aggressor in the confrontation. There was assuredly a violent situation occurring at Fred's on the evening in question. At the very least, an argument ensued between Craig and Hardy, and Craig was forcibly removed from the store. Evidence was presented to the jury showing that Hardy shoved Craig through the front door. There was also evidence that once outside, Hardy picked up Craig and slammed him against a post. Moreover, Craig testified that he had to do something to halt the attack because he feared that Hardy was about to turn back around and continue the beating. Hardy was considerably larger than Craig and apparently had the capability of doing substantial harm with his bare hands. When asked the reason he used the knife, Craig responded: "To protect myself. Get this man off me  you know  this man is trying to hurt me. I couldn't do nothing with him." At the least, it is arguable whether Hardy remained the aggressor throughout the confrontation or whether the incident was over when Hardy turned away from Craig. For this reason, we must conclude that there was an evidentiary basis for the conclusion that Craig was rightfully standing his ground when he fatally wounded Hardy even though the evidence also showed that the victim's first wound was inflicted in his back. Consequently, the submission of Instruction S-5 to the jury commanding them to find the defendant's actions justifiable only in the absence of a reasonable means of escape was reversible error.
Craig also complains of the trial court's refusal to grant his requested instruction D-4. In Cook v. State, 467 So.2d 203 *1301 (Miss. 1985), this Court held that the trial court committed reversible error in failing to grant a jury instruction which read:
You are instructed that while the danger which will justify the taking of another's life must be imminent, impending, and present, such danger need not be unavoidable except by killing in self defense. The Defendant, Clarence Edward Cook, need not have avoided the danger to his person presented by the deceased, Dudley Chandler, by flight. So long as the Defendant was in a place where he had the right to be and was neither the immediate provoker or aggressor, he may stand his ground without losing the right of self defense.
Id. at 209, n. 4 (emphasis added). We found that it was reversible error to deny this instruction because there was no evidence that Cook was the aggressor. In fact, the drunken victim approached Cook "brandishing the large section of a two-piece pool cue in a dark lounge." Id. at 204. In the case at hand, the trial court refused defendant's requested instruction D-4 which was, for all practical purposes, the exact instruction requested and denied in Cook. Craig's requested Instruction D-4 stated as follows:
The Court instructs the Jury that while the danger which will justify the taking of an adversary's life must be imminent, impending and present, yet it need not be unavoidable except by slaying. A man need not avoid danger by flight; but so long as he is in a place where he has a right to be, and is himself in no unlawful enterprise, not the provoker or aggressor in the combat, he may stand his ground.
(emphasis added). While the facts of this case are not as compelling as the facts in Cook, there was nevertheless an evidentiary basis, as discussed supra, for the trial court to have granted this instruction. A defendant is entitled to present their theory of the case to the jury as long as there is some evidentiary basis, even if the evidence is insufficient or of doubtful credibility, "and even though the sole testimony in support of the defense is the defendant's own testimony." Welch v. State, 566 So.2d 680, 684 (Miss. 1990). The trial court's denial of defendant's requested instruction D-4 was reversible error as well. This cause is reversed and remanded to the trial court where the defendant will be afforded a new trial.
REVERSED AND REMANDED.
HAWKINS, C.J., DAN M. LEE, P.J., and BANKS and McRAE, JJ., concur.
BANKS, J., concurs with separate written opinion joined by HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and SULLIVAN and McRAE, JJ.
SMITH, J., dissents with separate written opinion joined by JAMES L. ROBERTS, Jr., J.
PITTMAN, J., not participating.
BANKS, Justice, concurring:
I concur in the result reached by the majority. I write separately to add a few words in defense of that result.
The plain fact of the matter is that Craig testified to a version of events in stark contrast to that of the great majority of the witnesses. He denies making a remark about killing someone. He denies hearing Hardy make a statement about him being too small to fight. He denies that he was the aggressor and contends that Hardy was the aggressor. He professed fear for his life throughout. His only admission was that in hindsight it might have been better for him not to have acted as he did.
Assessment of his credibility is a task for the jury. The dissent would take on that task for this Court and resolve the dispute against Craig. Having thus resolved the factual dispute, it would follow that there is no need for an instruction. We are duty bound to respect the province of a properly instructed jury with respect to disputed facts, the resolution of which may lead to different legal results.
The State's instruction S-5 clearly compels flight if, under the circumstances, flight is reasonable. Perhaps that is as it should be. That is not our present law. Our present law is embodied in Craig's proffered instruction D-4. There was an evidentiary basis for the instruction in Craig's testimony. It was reversible error not to give it.
*1302 HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and SULLIVAN and McRAE, JJ., join this opinion.
SMITH, Justice, dissenting:
In this case, Craig failed to present sufficient evidence to warrant the giving of any self-defense instructions, much less to question the lack of a "stand your ground" instruction in light of the lower court's granting two self-defense instructions. Nevertheless, contrary to the majority's maintaining that Craig was denied an instruction on his theory of defense, the trial court did grant self-defense instruction S-2 and S-5 which, when read and considered as a whole, adequately instructed the jury on the reasonable standard to be applied to the facts of this case. The jury found Craig guilty and this Court should not reverse this case for the reason cited by the majority.
Craig argues and the majority accepts that he was entitled to a "stand your ground" self-defense instruction. The question turns on whether there was an evidentiary basis supporting Craig's right to stand his ground. Absent the appropriate circumstances existing at the time, Craig cannot claim such grounds, thereby utilizing this Court's opinions of Cook v. State, 467 So.2d 203 (Miss. 1985), Haynes v. State, 451 So.2d 227, 229 (Miss. 1984), Long v. State, 52 Miss. 23, 34 (1876).
Craig was not entitled to Instruction D-4 because he was the provocateur and the aggressor in the confrontation. An examination of the facts in evidence is indeed helpful in determining this question. Dwayne Rhodes testified that, prior to Hardy arriving at Fred's store, Craig had lost $80.00 playing "Tonk," a game with cards. Craig admitted losing $25.00 to $30.00. Rhodes stated that Craig left and returned to argue with Cleveland "Poochy" Jones, whereupon Peel Liggins, the manager of Fred's, tossed a beer can at Craig and told him to shut up and take it outside. Rhodes stated that Craig and Liggins "got into it." Craig left again. Isaac Hardy came into Fred's and the patrons there quit playing cards and were talking and laughing. Craig soon returned and appeared "real upset," putting his hand in Hardy's face. Rhodes stated that Hardy had done nothing to Craig at that point in time. Rhodes claimed that "No one struck a blow, there was no first blow." Rhodes said the two were wrestling, not fighting and that Hardy "got him and took him outside, and that Isaac [Hardy] turned to walk off, and Larry ran up on him from the back, stabbed [Hardy] and ran off fast."
Roosevelt Hollins testified that someone had chased Craig inside Fred's store and when an argument broke out George McCray grabbed Craig and they walked outside. Hollins stated that when the incident between Hardy and Craig broke out, they were "equally in control when they busted through the door and fought all over the porch." When asked by defense counsel about knocking over the 4 x 4 post, Hollins replied that "a little baby could knock that post over."
Michael Vicks testified that Craig got into it at the back of the store with Mr. Peel and that Peel threw a can at Craig. This incident was broken up and Craig left, but returned 15 to 20 minutes later after Peel had left. Vicks claimed that Craig immediately had words with Hardy and pointed his finger in Hardy's face, whereupon Hardy picked Craig up by his arms and politely took him outside. Vicks claimed that Hardy turned Craig loose and stated, "Man, I ain't going to fight you, you don't weigh enough for me." Vicks stated that when Hardy turned his back to go back inside Fred's store, Craig ran around the ice box and came running toward Mr. Hardy and hit him from behind. When Hardy turned around, Craig, with "two hands on the handle" of the knife, stabbed Hardy in the chest.
Rodney Esters testified that when he left the first time, Craig had stated that he was going to hurt somebody when he returned. Esters also stated, "I've heard him say on several occasions, you know, that he would be the one to hurt Mr. Hardy." Esters claimed that when Craig returned, he came in "like he was mad at somebody." When asked who started it, Esters replied, "Craig." Esters stated that it wasn't really a fight, but that it was "Craig who started the tussle."
While the majority is correct that Craig had the right to be in Fred's Stop and Shop *1303 as provided by the first requisite factor cited in Long, the majority appears to ignore Long's two remaining requisite factors: (1) that Craig not be the aggressor and (2) that his resistance not be disproportionate to the attack in order for Craig to be entitled to a "stand your ground"/"not compelled to flee" self-defense instruction. Long, 62 Miss. at 35. The facts of Long are totally contrary to this case.
In Long, the victim Bailey
drew a dirk-knife and stepped towards Long, raising the knife in his right hand, and grasping Long's shoulder with his left. Long, with both hands, pushed Bailey back; he retreated himself a step or two backwards, then turned and ran ten yards, or thirty feet. As he ran he was pulling at a pistol from behind, which seemed to hang in his clothes; as soon as it was drawn he faced around. He raised and leveled his pistol with great deliberation, and then lowered it. In an instant he raised it again, took deliberate aim, and fired.
Id. at 31-32. The Long Court noted that, "[t]he attitude and demonstrations of the deceased became a vital point in the case." Id. at 32. It is clear that the central issue in the case was "the position and action of Bailey at the moment of the firing." Id.
The overwhelming proof in the case sub judice was that Craig instigated this incident from the very beginning Craig, as the aggressor, cannot benefit from the requested instruction. The majority writes that the reason Craig used the knife was "to protect [him]self. Get [that] man off [him]  you know  [that] man [was] trying to hurt [him]. [He] couldn't do nothing with [Hardy]." Majority at 6. The majority fails to observe that Craig testified that he carried the knife with him every night and had the knife on his person the entire evening. The majority also writes that Hardy's substantial size as compared to Craig's means that Hardy "apparently had the capability of doing substantial harm with his bare hands." Yet, witness Rhodes stated, "No one struck a blow, there was no first blow." Even Craig admitted that "He didn't strike me with his fists or bodywise." The majority claims that Craig feared a continuance of "the beating." Majority, at 4. The record however, does not support any such beating. The most that can be gleaned from this record is that a loud mouthed, argumentative, fight-picking Craig was simply thrown out of Fred's store, head first, by Hardy, who had no intentions of fighting Craig and said so.
Cook is also distinguishable and thus inapplicable to the case sub judice. The Court noted, "There is not one iota of proof that Cook provoked the incident or was in any way an aggressor." Cook 467 So.2d at 211. Accordingly, all three requisite Long factors were present in Cook, thus this Court properly held that the defendant Cook was entitled to have the jury instructed: "He may stand his ground without losing the right of self-defense." Id. The majority in this case admits that the drunken victim approached Cook "brandishing the large section of a two-piece pool cue in a dark lounge." Majority at 1301. However, the majority fails to mention that in Cook the victim Dudley Chandler, "was as close as two or three feet away and heading in Cook's direction ... his demeanor menacing." Cook 467 So.2d at 204-206. In the case at bar, contrary to the facts in Cook there is overwhelming evidence that Craig was the immediate provoker or aggressor in this incident, that Hardy was not armed and that Hardy rather than advancing towards Craig, had turned his back and was walking away.
Haynes v. State, 451 So.2d 227 (Miss. 1984) (Hawkins, J.), relied upon by the majority, is also distinguishable from the case sub judice. The facts in Haynes reveal: "Haynes had unquestionably been previously assaulted by Mitchell, and provoked." Haynes, 451 So.2d at 228. The Haynes Court noted:
It has always been the law in this state that a defendant is not deprived of the right to claim self-defense in a slaying even if he could have avoided the threat to his safety by fleeing.
Such an instruction is not often applicable to the facts of a case, however. In this case we think the judge should have either granted the instruction, or some instruction that embraced this principle. There was some testimony by Haynes that he *1304 began to walk away when the trouble started, and the jury could have wondered why he did not simply leave. Whenever, from the facts of the case, it appears that the defendant could have avoided the fatal difficulty only by precipitous retreat, but did not leave, if the other requisite factors are present as stated in Long, supra, then the defendant is entitled to such an instruction.

Id. at 229 (emphasis added).
Justice Hawkins, writing for the Court in Haynes, wisely preserved all three requisite factors of Long in mandating that Haynes was entitled to the instruction under the facts of that case. What should be rather obvious however from the above quoted language is that it is the facts of a case that control and determine whether all three requisite factors are present thus determining whether the instruction may properly be given. The case at bar is clearly distinguishable due to the glaring absence of the two remaining factors: (1) that Craig was the initial instigator or aggressor, and (2) that his resistance in stabbing Hardy, an unarmed man, in the back and again in the chest, which resulted in death, was certainly disproportionate to Hardy's actions. Returning to the case at bar, this Court is not presented with the factual situation where Hardy was advancing upon Craig with all three requisite factors being present, thus entitling Craig to the "stand your ground" to repel the advance of his aggressor instruction.
Next, the majority admits that it is arguable whether Hardy remained the aggressor throughout the confrontation or whether the incident was over when Hardy turned away from Craig. Craig admitted that "[he] heard people say [Hardy] was heading back into Fred's, and that Hardy was laughing at [him]." When asked whether Hardy was mad or upset, Craig responded, "No, he had the advantage over me, so I stabbed him." Craig was asked when Hardy turned back why he didn't walk away. Craig responded, "I wasn't thinking at the time." Prosecutor Pittman asked, "At that time, your life was not in jeopardy, was it?" Craig responded, "Looking back, that is true." (emphasis added).
How could Craig possibly be entitled to the instruction based upon this admission? Craig also admitted that he struck the first blow to Hardy when his back was turned and that when Hardy turned around, Craig braced his hand on Hardy's chest as he struck Hardy in the chest with the butcher knife. The jury could certainly have reasoned that Hardy presented no threat to Craig since he had been freed by Hardy who remained on the porch while Craig was outside of Fred's in the middle of the street. Regardless of prior circumstances between the two individuals, at that point in time, there was no actual, present, or urgent danger to Craig. Nor was there reasonable ground to apprehend an imminent danger of such design by Hardy to do Craig some great bodily harm. Common sense would dictate that the incident was over as Hardy laughingly turned his back, stated he didn't want to fight Craig and started to go back inside of Fred's store. The jury could certainly have been justified in rejecting self-defense offered by Craig.
There was no error in granting instruction S-5. If anything, it was Craig's good fortune to have received any self-defense instructions. The trial judge, in response to Craig's objection, clearly understood the principle of law established by this Court in Long, Haynes and Cook, but noted: "I understand that is a correct statement of the law. It simply doesn't apply here where the defendant is claiming that someone was advancing on him and he stood his ground and repelled the advance. That is not what he said." The learned trial judge was eminently correct as there was no testimony that Hardy was advancing on Craig thereby authorizing that he might stand his ground and repel the aggressor. In fact, S, when read as a whole, the majority suggests that the situation facing Craig was such an imminent, present, real or apparent and urgent danger to his life that no reasonable alternative existed for Craig except to take Hardy's life. The instruction when read with S-2 and considered with all other instructions as a whole adequately informed the jury regarding self-defense. Instruction *1305 S-2, to which Craig raised no objection, specifically instructed the jury as follows:
The Court instructs the Jury that to make a killing justifiable on the grounds of self-defense, the danger to the Defendant must be either actual, present and urgent or the defendant must have reasonable grounds to apprehend a design on the part of the victim to kill him or to do him some great bodily harm, and in addition to this, he must have reasonable grounds to apprehend that there is imminent danger of such design being accomplished. It is for the Jury to determine the reasonableness of the Defendant's acts. (emphasis added).
Self-defense can be claimed when certain facts and circumstances in evidence exist. As this Court stated in Wadford v. State, 385 So.2d 951, 955 (Miss. 1980), self defense may be claimed under conditions where the "defendant was justified in having committed the homicide because he was, or had reasonable grounds to believe that he was, in imminent danger of suffering death or great bodily harm at the hands of the person killed." Id. (emphasis added). In Wadford the instructions correctly informed the jury of the "reasonable person" standard for the jury to judge the specific facts and circumstances of the case sub judice. The jury did not believe that self-defense was reasonable under the facts and circumstances presented and promptly found the defendant guilty of the lesser included offense of manslaughter.
Although Craig was not entitled to a self-defense instruction, nevertheless he received proper instructions anyway. In Strong v. State, 600 So.2d 199 (Miss. 1992), this Court found that refusing a self-defense instruction was not error where the evidence did not support the giving of such instruction. Craig's own testimony fails to warrant the giving of a self-defense instruction. The majority's contention about the size differential between the two men is of no concern either, since that issue has been previously decided. This Court, in Marshall v. State, 220 Miss. 846, 855, 72 So.2d 169 (Miss. 1954), stated "The mere fact that the deceased may have been physically capable of inflicting great and serious bodily harm upon the defendant with his feet and hands, and that the defendant was afraid of the deceased, was not sufficient in itself to justify the stabbing."
The trial court granted Craig the only instruction on self-defense to which he could remotely have been entitled. This Court in Cook stated:
In accord with common sense, we have held that, where one jury instruction adequately covers the defendant's theory of self-defense, there is no error in refusal of a second or redundant instruction. Evans v. State, 457 So.2d 957, 959 (Miss. 1983).
467 So.2d at 210.
The bottom line to all this is that Craig apparently was roaming about that night spoiling for a fight. He got into arguments with other patrons of Fred's on several different occasions that same night. Craig lost money in a card game at Fred's and apparently left the store angry. Craig stated that he was going to hurt somebody when he returned. He also got into an argument with another individual at another grocery store shortly before returning to Fred's. Upon his return, Craig got into an argument with Liggins, the manager on duty at Fred's store. Liggins threw a beer can at him and ordered Craig and another individual with whom he was arguing, to take it outside of the store premises. Witnesses testified that Craig acted like he was mad at somebody when he returned. There was testimony that Craig was "real upset." Others stated that it was Craig who started the tussle with Hardy. Witnesses testified that Hardy simply picked Craig up by the hands, wrestled with him and removed him from the premises by going head first through the door. They wrestled all over the porch and knocked loose the post, which according to one witness was so flimsy that, "a baby could have knocked it over." No blows were passed between the two men, as admitted by Craig. Craig heard people say that Hardy was going back inside of Fred's. Craig heard Hardy laughing at him. Witnesses testified that Hardy stated Craig was too little and he wasn't going to fight him. Another witness testified that Craig had stated on several past occasions that he (Craig) would be the one to hurt *1306 Hardy. Craig admitted that Hardy wasn't mad or upset. Hardy had turned Craig loose in the street and turned to enter the store when Craig, armed with the butcher knife that he always carried at night, stabbed Hardy in the back and again in the chest. Craig stated simply that he was scared. Referring to their size differences, Craig stated that Hardy, "had the advantage over me," so I stabbed him. More importantly, when asked whether at that time it was true that his life was not in jeopardy, Craig replied, "Looking back, that is true." Craig waited until Hardy announced that he was not going to fight Craig, turned his back and started to leave. Then Craig attacked an unarmed man with a butcher knife, stabbing him in the back and dropping the knife in the process. Quickly, Craig picked it up and with both hands on the handle, stabbed Hardy in the chest, killing him in the process. Craig certainly intended that which he did. Craig was the provoker, aggressor, and killer, all without provocation by Hardy. As noted in Haynes, considering the facts of this case, Craig was not entitled to a "stand your ground" self-defense instruction. The jury, nevertheless, was properly instructed and their verdict of guilty of manslaughter should stand.
I respectfully dissent.
ROBERTS, J., joins this opinion.