In this case, Craig failed to present sufficient evidence to warrant the giving of any self-defense instructions, much less to question the lack of a "stand your ground" instruction in light of the lower court's granting two self-defense instructions. Nevertheless, contrary to the majority's maintaining that Craig was denied an instruction on his theory of defense, the trial court did grant self-defense instruction S-2 and S-5 which, when read and considered as a whole, adequately instructed the jury on the reasonable standard to be applied to the facts of this case. The jury found Craig guilty and this Court should not reverse this case for the reason cited by the majority.
Craig argues and the majority accepts that he was entitled to a "stand your ground" self-defense instruction. The question turns on whether there was an evidentiary basis supporting Craig's right to stand his ground. Absent the appropriate circumstances existing at the time, Craig cannot claim such grounds, thereby utilizing this Court's opinions of Cook v. State, 467 So.2d 203
(Miss. 1985), Haynes v. State, 451 So.2d 227, 229 (Miss. 1984),Long v. State, 52 Miss. 23, 34 (1876).
Craig was not entitled to Instruction D-4 because he was the provocateur and the aggressor in the confrontation. An examination of the facts in evidence is indeed helpful in determining this question. Dwayne Rhodes testified that, prior to Hardy arriving at Fred's store, Craig had lost $80.00 playing "Tonk," a game with cards. Craig admitted losing $25.00 to $30.00. Rhodes stated that Craig left and returned to argue with Cleveland "Poochy" Jones, whereupon Peel Liggins, the manager of Fred's, tossed a beer can at Craig and told him to shut up and take it outside. Rhodes stated that Craig and Liggins "got into it." Craig left again. Isaac Hardy came into Fred's and the patrons there quit playing cards and were talking and laughing. Craig soon returned and appeared "real upset," putting his hand in Hardy's face. Rhodes stated that Hardy had done nothing to Craig at that point in time. Rhodes claimed that "No one struck a blow, there was no first blow." Rhodes said the two were wrestling, not fighting and that Hardy "got him and took him outside, and that Isaac [Hardy] turned to walk off, and Larry ran up on him from the back, stabbed [Hardy] and ran off fast."
Roosevelt Hollins testified that someone had chased Craig inside Fred's store and when an argument broke out George McCray grabbed Craig and they walked outside. Hollins stated that when the incident between Hardy and Craig broke out, they were "equally in control when they busted through the door and fought all over the porch." When asked by defense counsel about knocking over the 4 x 4 post, Hollins replied that "a little baby could knock that post over."
Michael Vicks testified that Craig got into it at the back of the store with Mr. Peel and that Peel threw a can at Craig. This incident was broken up and Craig left, but returned 15 to 20 minutes later after Peel had left. Vicks claimed that Craig immediately had words with Hardy and pointed his finger in Hardy's face, whereupon Hardy picked Craig up by his arms and politely took him outside. Vicks claimed that Hardy turned Craig loose and stated, "Man, I ain't going to fight you, you don't weigh enough for me." Vicks stated that when Hardy turned his back to go back inside Fred's store, Craig ran around the ice box and came running toward Mr. Hardy and hit him from behind. When Hardy turned around, Craig, with "two hands on the handle" of the knife, stabbed Hardy in the chest.
Rodney Esters testified that when he left the first time, Craig had stated that he was going to hurt somebody when he returned. Esters also stated, "I've heard him say on several occasions, you know, that he would be the one to hurt Mr. Hardy." Esters claimed that when Craig returned, he came in "like he was mad at somebody." When asked who started it, Esters replied, "Craig." Esters stated that it wasn't really a fight, but that it was "Craig who started the tussle."
While the majority is correct that Craig had the right to be in Fred's Stop and Shop *Page 1303 
as provided by the first requisite factor cited in Long, the majority appears to ignore Long's two remaining requisite factors: (1) that Craig not be the aggressor and (2) that his resistance not be disproportionate to the attack in order for Craig to be entitled to a "stand your ground"/"not compelled to flee" self-defense instruction. Long, 62 Miss. at 35. The facts of Long are totally contrary to this case.
 In Long, the victim Bailey drew a dirk-knife and stepped towards Long, raising the knife in his right hand, and grasping Long's shoulder with his left. Long, with both hands, pushed Bailey back; he retreated himself a step or two backwards, then turned and ran ten yards, or thirty feet. As he ran he was pulling at a pistol from behind, which seemed to hang in his clothes; as soon as it was drawn he faced around. He raised and leveled his pistol with great deliberation, and then lowered it. In an instant he raised it again, took deliberate aim, and fired.
Id. at 31-32. The Long Court noted that, "[t]he attitude and demonstrations of the deceased became a vital point in the case."Id. at 32. It is clear that the central issue in the case was "the position and action of Bailey at the moment of the firing."Id.
The overwhelming proof in the case sub judice was that Craig instigated this incident from the very beginning Craig, as the aggressor, cannot benefit from the requested instruction. The majority writes that the reason Craig used the knife was "to protect [him]self. Get [that] man off [him] — you know — [that] man [was] trying to hurt [him]. [He] couldn't do nothing with [Hardy]." Majority at 6. The majority fails to observe that Craig testified that he carried the knife with him every night and had the knife on his person the entire evening. The majority also writes that Hardy's substantial size as compared to Craig's means that Hardy "apparently had the capability of doing substantial harm with his bare hands." Yet, witness Rhodes stated, "No one struck a blow, there was no first blow." Even Craig admitted that "He didn't strike me with his fists or bodywise." The majority claims that Craig feared a continuance of "the beating." Majority, at 4. The record however, does not support any such beating. The most that can be gleaned from this record is that a loud mouthed, argumentative, fight-picking Craig was simply thrown out of Fred's store, head first, by Hardy, who had no intentions of fighting Craig and said so.
Cook is also distinguishable and thus inapplicable to the case sub judice. The Court noted, "There is not one iota of proof that Cook provoked the incident or was in any way an aggressor." Cook 467 So.2d at 211. Accordingly, all three requisite Long factors were present in Cook, thus this Court properly held that the defendant Cook was entitled to have the jury instructed: "He may stand his ground without losing the right of self-defense." Id. The majority in this case admits that the drunken victim approached Cook "brandishing the large section of a two-piece pool cue in a dark lounge." Majority at 1301. However, the majority fails to mention that in Cook the victim Dudley Chandler, "was as close as two or three feet away and heading in Cook's direction . . . his demeanor menacing."Cook 467 So.2d at 204-206. In the case at bar, contrary to the facts in Cook there is overwhelming evidence that Craig was the immediate provoker or aggressor in this incident, that Hardy was not armed and that Hardy rather than advancing towards Craig, had turned his back and was walking away.
Haynes v. State, 451 So.2d 227 (Miss. 1984) (Hawkins, J.), relied upon by the majority, is also distinguishable from the case sub judice. The facts in Haynes reveal: "Haynes had unquestionably been previously assaulted by Mitchell, and provoked." Haynes, 451 So.2d at 228. The Haynes Court noted:
 It has always been the law in this state that a defendant is not deprived of the right to claim self-defense in a slaying even if he could have avoided the threat to his safety by fleeing.
 Such an instruction is not often applicable to the facts of a case, however. In this case we think the judge should have either granted the instruction, or some instruction that embraced this principle. There was some testimony by Haynes that he *Page 1304 
began to walk away when the trouble started, and the jury could have wondered why he did not simply leave. Whenever, from the facts of the case, it appears that the defendant could have avoided the fatal difficulty only by precipitous retreat, but did not leave, if the other requisite factors are present as stated in Long, supra, then the defendant is entitled to such an instruction.
Id. at 229 (emphasis added).
Justice Hawkins, writing for the Court in Haynes, wisely preserved all three requisite factors of Long in mandating that Haynes was entitled to the instruction under the facts of that case. What should be rather obvious however from the above quoted language is that it is the facts of a case that control anddetermine whether all three requisite factors are present thusdetermining whether the instruction may properly be given. The case at bar is clearly distinguishable due to the glaring absence of the two remaining factors: (1) that Craig was the initial instigator or aggressor, and (2) that his resistance in stabbing Hardy, an unarmed man, in the back and again in the chest, which resulted in death, was certainly disproportionate to Hardy's actions. Returning to the case at bar, this Court is not presented with the factual situation where Hardy was advancing upon Craig with all three requisite factors being present, thus entitling Craig to the "stand your ground" to repel the advance of his aggressor instruction.
Next, the majority admits that it is arguable whether Hardy remained the aggressor throughout the confrontation or whether the incident was over when Hardy turned away from Craig. Craig admitted that "[he] heard people say [Hardy] was heading back into Fred's, and that Hardy was laughing at [him]." When asked whether Hardy was mad or upset, Craig responded, "No, he had the advantage over me, so I stabbed him." Craig was asked when Hardy turned back why he didn't walk away. Craig responded, "I wasn't thinking at the time." Prosecutor Pittman asked, "At that time,your life was not in jeopardy, was it?" Craig responded, "Lookingback, that is true." (emphasis added).
How could Craig possibly be entitled to the instruction based upon this admission? Craig also admitted that he struck the first blow to Hardy when his back was turned and that when Hardy turned around, Craig braced his hand on Hardy's chest as he struck Hardy in the chest with the butcher knife. The jury could certainly have reasoned that Hardy presented no threat to Craig since he had been freed by Hardy who remained on the porch while Craig was outside of Fred's in the middle of the street. Regardless of prior circumstances between the two individuals, at that point in time, there was no actual, present, or urgent danger to Craig. Nor was there reasonable ground to apprehend an imminent danger of such design by Hardy to do Craig some great bodily harm. Common sense would dictate that the incident was over as Hardy laughingly turned his back, stated he didn't want to fight Craig and started to go back inside of Fred's store. The jury could certainly have been justified in rejecting self-defense offered by Craig.
There was no error in granting instruction S-5. If anything, it was Craig's good fortune to have received any self-defense instructions. The trial judge, in response to Craig's objection, clearly understood the principle of law established by this Court in Long, Haynes and Cook, but noted: "I understand that is a correct statement of the law. It simply doesn't apply here where the defendant is claiming that someone was advancing on him and he stood his ground and repelled the advance. That is not what he said." The learned trial judge was eminently correct as there was no testimony that Hardy was advancing on Craig thereby authorizing that he might stand his ground and repel the aggressor. In fact, S, when read as a whole, the majority suggests that the situation facing Craig was such an imminent, present, real or apparent and urgent danger to his life that no reasonable alternative existed for Craig except to take Hardy's life. The instruction when read with S-2 and considered with all other instructions as a whole adequately informed the jury regarding self-defense. Instruction *Page 1305 
S-2, to which Craig raised no objection, specifically instructed the jury as follows:
 The Court instructs the Jury that to make a killing justifiable on the grounds of self-defense, the danger to the Defendant must be either actual, present and urgent or the defendant must have reasonable grounds to apprehend a design on the part of the victim to kill him or to do him some great bodily harm, and in addition to this, he must have reasonable grounds to apprehend that there is imminent danger of such design being accomplished. It is for the Jury to determine the reasonableness of the Defendant's acts. (emphasis added).
Self-defense can be claimed when certain facts and circumstances in evidence exist. As this Court stated in Wadfordv. State, 385 So.2d 951, 955 (Miss. 1980), self defense may be claimed under conditions where the "defendant was justified in having committed the homicide because he was, or had reasonablegrounds to believe that he was, in imminent danger of sufferingdeath or great bodily harm at the hands of the person killed."Id. (emphasis added). In Wadford the instructions correctly informed the jury of the "reasonable person" standard for the jury to judge the specific facts and circumstances of the casesub judice. The jury did not believe that self-defense was reasonable under the facts and circumstances presented and promptly found the defendant guilty of the lesser included offense of manslaughter.
Although Craig was not entitled to a self-defense instruction, nevertheless he received proper instructions anyway. In Strongv. State, 600 So.2d 199 (Miss. 1992), this Court found that refusing a self-defense instruction was not error where the evidence did not support the giving of such instruction. Craig's own testimony fails to warrant the giving of a self-defense instruction. The majority's contention about the size differential between the two men is of no concern either, since that issue has been previously decided. This Court, in Marshallv. State, 220 Miss. 846, 855, 72 So.2d 169 (Miss. 1954), stated "The mere fact that the deceased may have been physically capable of inflicting great and serious bodily harm upon the defendant with his feet and hands, and that the defendant was afraid of the deceased, was not sufficient in itself to justify the stabbing."
The trial court granted Craig the only instruction on self-defense to which he could remotely have been entitled. This Court in Cook stated:
 In accord with common sense, we have held that, where one jury instruction adequately covers the defendant's theory of self-defense, there is no error in refusal of a second or redundant instruction. Evans v. State, 457 So.2d 957, 959 (Miss. 1983).
467 So.2d at 210.
The bottom line to all this is that Craig apparently was roaming about that night spoiling for a fight. He got into arguments with other patrons of Fred's on several different occasions that same night. Craig lost money in a card game at Fred's and apparently left the store angry. Craig stated that he was going to hurt somebody when he returned. He also got into an argument with another individual at another grocery store shortly before returning to Fred's. Upon his return, Craig got into an argument with Liggins, the manager on duty at Fred's store. Liggins threw a beer can at him and ordered Craig and another individual with whom he was arguing, to take it outside of the store premises. Witnesses testified that Craig acted like he was mad at somebody when he returned. There was testimony that Craig was "real upset." Others stated that it was Craig who started the tussle with Hardy. Witnesses testified that Hardy simply picked Craig up by the hands, wrestled with him and removed him from the premises by going head first through the door. They wrestled all over the porch and knocked loose the post, which according to one witness was so flimsy that, "a baby could have knocked it over." No blows were passed between the two men, as admitted by Craig. Craig heard people say that Hardy was going back inside of Fred's. Craig heard Hardy laughing at him. Witnesses testified that Hardy stated Craig was too little and he wasn't going to fight him. Another witness testified that Craig had stated on several past occasions that he (Craig) would be the one to hurt *Page 1306 
Hardy. Craig admitted that Hardy wasn't mad or upset. Hardy had turned Craig loose in the street and turned to enter the store when Craig, armed with the butcher knife that he always carried at night, stabbed Hardy in the back and again in the chest. Craig stated simply that he was scared. Referring to their size differences, Craig stated that Hardy, "had the advantage over me," so I stabbed him. More importantly, when asked whether at that time it was true that his life was not in jeopardy, Craig replied, "Looking back, that is true." Craig waited until Hardy announced that he was not going to fight Craig, turned his back and started to leave. Then Craig attacked an unarmed man with a butcher knife, stabbing him in the back and dropping the knife in the process. Quickly, Craig picked it up and with both hands on the handle, stabbed Hardy in the chest, killing him in the process. Craig certainly intended that which he did. Craig was the provoker, aggressor, and killer, all without provocation by Hardy. As noted in Haynes, considering the facts of this case, Craig was not entitled to a "stand your ground" self-defense instruction. The jury, nevertheless, was properly instructed and their verdict of guilty of manslaughter should stand.
I respectfully dissent.
ROBERTS, J., joins this opinion.