# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2021-KA-00734-SCT

*HANDY ANTHONY WILLIS, JR., a/k/a HANDY WILLIS, JR., a/k/a HANDY ANTHONY WILLIS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/14/2021 |
| TRIAL JUDGE: | HON. PRENTISS GREENE HARRELL |
| TRIAL COURT ATTORNEYS: | JENNIE AUSTIN EICHELBERGER |
| | JONATHAN MATTHEW EICHELBERGER |
| | KIMBERLY THOMAS HARLIN |
| | LAUREL AMANDA RUTH BLUE |
| COURT FROM WHICH APPEALED: | MARION COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JONATHAN MATTHEW EICHELBERGER |
| | MADELINE MARCANTEL ILES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: CASEY BONNER FARMER |
| DISTRICT ATTORNEY: | HALDON J. KITTRELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 12/15/2022 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**KITCHENS, PRESIDING JUSTICE, FOR THE COURT:**

¶1. Handy Anthony Willis, Jr., appeals his conviction of first degree murder under Mississippi Code Section 97-3-19(1)(a) (Rev. 2020). Willis was found guilty of shooting and killing his former girlfriend, Tamaneka Alexander, in Marion County, Mississippi. He was sentenced to imprisonment for life without the possibility of parole.

¶2.    He argues that "[t]he trial court erred in three critical ways that deprived [him] of a fair trial." First, he asserts that the trial court violated his constitutional right to confront Police Captain Pete Williams, the lead investigator assigned to his case, about the officer's prior inconsistent statement. Next, he contends that the trial court erroneously denied his self-defense jury instruction. Finally, he asserts that the evidence is insufficient to support his conviction.

**FACTS**

¶3.    Willis and Tamaneka Alexander had been in a romantic relationship but were in the process of ending that relationship. Before the relationship soured, the couple had lived together with Tamaneka Alexander's five children on Water Valley Road in Marion County, Mississippi. Once the two had agreed to break up, Willis "secured a new home for [Tamaneka Alexander] and her kids" on Mount Carmel Church Road. He provided furniture for the new house, which was to be delivered on October 6, 2017.

¶4.    Willie Martin, Willis's friend, worked for Aaron's Furniture Store and had agreed to help Willis deliver the furniture to Tamaneka Alexander's new house. On the night of October 6, 2017, Martin picked Willis up from the Water Valley Road residence in an Aaron's delivery truck and drove to the house on Mount Carmel. When the two men arrived at the Mount Carmel address, Tamaneka Alexander was not at the house as Willis and she had arranged. As a result, the men could not deliver the furniture and decided to return to the Water Valley Road residence. Martin testified that, during the drive back, Willis and

2

Tamaneka Alexander were texting each other back and forth. Tamaneka Alexander informed Willis that she and the father of her twins had used Willis's truck. Willis responded that he wanted his truck back and sent several other text messages that said, in relevant part: "someone bout to die tonight," "you going to see who I can be now," and "it's bout too be a problem."[1] At 9:42 p.m., Willis sent his last text message to Tamaneka Alexander, in which he stated, "Girl not studden you shit u fucking disrespectful but tonight u in trouble." Martin testified that Willis did not seem "mad or upset, but just kind of frustrated" as he was texting Tamaneka Alexander.

¶5.     When they arrived at the house on Water Valley Road, Willis went inside after telling Martin he could get out of the truck, which Martin did after checking his cell phone. After getting out of the truck, Martin walked to the front door and saw Willis and Tamaneka Alexander near the kitchen area arguing about some keys. Martin testified that the pair moved out of his sight line and then he "heard like a pop or a gunshot[.]" Martin stood frozen at the front doorway until he heard a little girl crying and screaming, "Anthony, why would you do it? Why did you do it?" The little girl was Tamaneka Alexander's nine-year-old daughter, Brooke.[2] Moved by the child's voice, Martin went inside and saw Tamaneka Alexander lying on the floor. As Martin walked inside, Willis walked past him and went

_____

[1]Captain Williams testified that the text messages in Willis's phone were extracted verbatim by means of an extraction system Williams described.

[2]Both Willis and the State use this pseudonym for the minor. This Court does likewise to help protect the child's identity.

outside. Martin could not tell whether Willis had a weapon or injuries at that time. Martin decided to leave the house, and as he was leaving, he found Willis on the ground by a shed. He went to "check on him and find out what was going on," and as he approached Willis, he could hear Willis stating that "his life is over." It was at this point that Martin saw a gun in Willis's hand. Out of fear, Martin departed in the Aaron's delivery truck.

¶6.     Prior to Willis's arrival, Brooke and two of her younger siblings had been in the back of the house preparing to take a shower. Their mother "sat on the couch folding clothes[.]" The child testified that she heard the following:  Willis "bust up in the house fussing[,]" people were running, there was a gunshot, and then she heard someone fall. After hearing a person fall, Brooke and her younger sister went to investigate and discovered their mother lying on the floor near the laundry room. Willis was holding a gun and was pointing it at Tamaneka Alexander, saying, "I told you not to do that." Brooke testified that Willis did not appear to have any injuries at that time. As Willis continued fussing, "the Aaron's man" came in, said, "Oh, my God," and then left. According to Brooke, Willis went outside for a couple of minutes, then came back in and said, "Oh, my God, is she dead? Is she dead?" and then went back outside. When Willis went outside the second time, Brooke called 911.[3] At some point, Brooke heard another gunshot, which had come from outdoors.

¶7.     Deputy Sheriffs Caleb Williams and Grant McArthur received a call from their dispatcher around 9:45 p.m. to respond to the scene of a shooting. Both arrived at the scene

---

[3]The 911 call was received at 9:45 p.m.

to find Tamaneka Alexander inside the house with a gunshot wound to her head and Willis in the yard with a gunshot wound to his abdomen. A small black revolver with wooden grips was discovered next to Willis's feet.[4] Both were transported by ambulance to a local hospital. Tamaneka Alexander did not survive her injury.

¶8.    The investigation was led by Captain Pete Williams of the Marion County Sheriff's Department. Early in the investigation, officers learned that Brooke had said during the 911 call that Willis had left in the Aaron's truck, which prompted law enforcement officers to be on the lookout for the truck. The Aaron's truck later was stopped by police and its driver, Martin, was returned to the crime scene. While at the scene, Martin gave a statement to Captain Williams, in which he asserted that an altercation had ensued between Willis and Tamaneka Alexander. Martin continued, stating that when he attempted to leave the house he saw Willis come out of the house with a gun, although Martin could not be sure if Willis was being chased by someone or not.

¶9.    Captain Williams sent Brooke[5] to Kids Hub, a child advocacy center, for a "forensic interview" to be conducted, which Williams observed. After hearing Brooke's interview, Captain Williams questioned Martin again. During the second interview, Captain Williams

---

[4]Three guns were found by the officers:  one in the yard next to Willis's feet, one on the porch of the shed, and one in the bedroom. Forensic testing determined that the gun recovered next to Willis's feet was a .22-Heritage Rough Rider revolver and was the weapon with which Tamaneka Alexander and Willis had been shot.

[5]Brooke's younger siblings also were sent to Kids Hub to have so-called forensic interviews conducted. But Brooke was the only child who testified at Willis's trial.

informed Martin that he had "observed the interview with the child and that her statement wavered from what [Martin] told [Williams] initially." This prompted Martin to state that "the girl's statement was true," and he changed his statement to one that implicated Willis as having shot Tamaneka Alexander. At trial, Martin testified that the reason he had changed his statement was to tell the truth. On cross examination, defense counsel asked Martin whether he had changed his statement after hearing Brooke's statement, to which Martin responded in the affirmative. But on redirect examination Martin clarified that he did not know what Brooke had told Captain Williams when he provided his second statement. He agreed with the prosecutor that if their statements matched, it was because that was what had happened.

¶10.    On June 12, 2019, Willis was indicted for the first degree murder of Tamaneka Alexander. His trial began on April 12, 2021. At trial, the State presented Lori Beall, an expert in the field of firearm identification from the Mississippi Forensics Lab, who testified that Willis and Tamaneka Alexander both were shot with the .22-Heritage Rough Rider revolver. Additionally, Beall explained to the jury that in order to fire the revolver a person has to pull the gun's hammer back before firing each time,[6] and she explained the gun's hammer-block safety. A test conducted by Joseph Heflin from the Mississippi Forensics Laboratory showed that none of the blood samples collected from inside the house matched Willis's DNA. Dr. Lisa Funte, the medical examiner, testified that the cause of Tamaneka

---

[6]The expert explained the operation of a single-action revolver.

Alexander's death was a gunshot wound to the head and that the manner of death was homicide. On cross-examination, Dr. Funte acknowledged that "[she] was not present, so [she] cannot completely rule out an accident" as the manner of death.

¶11.    The defense recalled Captain Williams as its sole witness in its case in chief. Defense counsel questioned Captain Williams regarding his interactions with Martin, especially the circumstances surrounding Martin's second interview in which he had changed his statement to accuse Willis of the murder. Captain Williams denied having told Martin any details from Brooke's statement, saying only that he had observed her interview and that her statement had differed from Martin's initial statement. Defense counsel then asked whether Captain Williams remembered testifying at the preliminary hearing, to which he responded, "I don't recall." Defense counsel used a transcript of that hearing to refresh Williams's memory. After attempting to refresh his memory, the defense attorney asked the officer whether he had disclosed the contents of Brooke's statement during Martin's second interview, which Captain Williams denied repeatedly. Then, Willis's lawyer asked Williams whether he had recorded Martin's second interview. Captain Williams denied having recorded that interview. Defense counsel represented to the trial court that Captain Williams had given a different answer than he had given at the preliminary hearing. The attorney said that he had a recording of Captain Williams's preliminary hearing testimony and that the officer had said at that time that he had recorded Martin's second interview. The trial court called a recess in order to address the matter out of the presence of the jury.

7

¶12. During the recess, defense counsel asked to play a portion of the preliminary hearing recording in order to refresh Captain Williams's memory. The trial court granted the request. Prior to playing the recording, defense counsel asked Captain Williams again whether he had recorded Martin's second interview. Williams replied he had not because the second interview had taken place in his office and because he had no recording devices there. Defense counsel, outside the presence of the jury, played a portion of the preliminary hearing audio recording of Williams's testimony:

> Q: On what day did you speak with him the second time?
>
> A: I spoke with him after the forensic interview with the nine-year old juvenile.
>
> Q: Were either one of these conversations recorded?
>
> A: Yes.
>
> Q: Audio? Video? What fashion?
>
> A: The second interview was video. The first interview was conducted on the scene and was not video or audio.

After listening to the recording, Captain Williams continued to insist that his second interview of Martin had not been recorded because that interview had occurred in Williams's office and because he "might have been confused as to what was asked." The defense attorney then asked that the recording be used for impeachment purposes and be played "in front of the jury so that [Captain Williams] can explain to the jury why it doesn't match." The State did not object. But the trial court expressed concern with the "potential perjury"

8

implications.[7]

¶13. The trial court conducted a lengthy investigation into whether there had been an honest mistake or potential perjury by Captain Williams as to whether there was indeed a recording of Williams's second interview with Martin.[8] The trial court ordered, *sua sponte*, the issuance of a subpoena to the Marion County Sheriff's Office for any recording related to this investigation. The next day, Chief Deputy Jamie Singley with the Marion County Sheriff's Office testified outside the jury's presence that the sheriff's office had replaced its old recording system on September 27, 2019, due to its malfunctioning. He testified also that the old recording system only kept recordings for seven days, but if there had been a recording, it would have gotten "burned" and put into a case file. He deduced that there was no recording because none had been added to the case file. Asked whether an investigator's office had the capability to record, Singley responded that the individual offices had not had the ability to record video or audio since he started in his position in 2008.

¶14. On Thursday, April, 15, 2021, an in-chambers conference was held with the prosecutors, defense counsel, and Leigh Berry, the attorney hired by Captain Williams to represent him during the judge's perjury investigation. After the conference, the trial judge announced that he "[was] satisfied that there is no recording" of Martin's second interview.

---

[7]The question of perjury is a different issue from the credibility issue and was not before the court at that time.

[8]The trial judge said the perjury investigation was necessary because "[t]he integrity and the necessity for the veracity to be conducted in my [c]ourt is paramount to me."

9

Accordingly, the trial judge concluded that Captain Williams had not committed perjury.

¶15.    The trial resumed after two days of the perjury investigation. Defense counsel resumed his inquiry of Captain Williams concerning whether he had told Martin details of Brooke's statement and if he had recorded Martin's second interview, asking specifically about the preliminary hearing: "[I]f you testified under oath at a preliminary matter that you did record that interview, would that be false?" Captain Williams acknowledged that he had testified at the preliminary hearing that he had a video of Martin's second interview but that this was a mistake. Specifically, he said, "I'm human. I made a mistake during the preliminary hearing. At that time I was being asked about two sets of videos and I made a mistake stating that I had a video of Mr. Martin's interview." The defense then asked the trial court's permission to play the recording of the preliminary hearing before the jury "so that he can have his recollection refreshed as to what was being asked of him during that preliminary hearing." But the State objected, saying it was unnecessary to play the recording because Captain Williams had admitted that he made a mistake in his previous testimony and had given false testimony under oath. Defense counsel responded that "[i]t's pretty clearly not a mistake[;]" "[w]e were talking about the first interview with Willie Martin." The trial judge sustained the State's objection.

¶16.    Defense counsel then asked for leave to make a proffer of the recording, which was granted. Before the proffer, the following exchange occurred between the prosecutor and the defense:

Prosecutor: If I may, just to make sure I understand what is going on. So, Matt, you're saying that—when you say "mistake"—my understanding of Pete's testimony is he mistakenly said there was a recording of Willie Martin's second interview.

The mistake is that there was not a recording.

Defense: He said, "I was mistaken because I believed you were talking about the interview of the nine-year-old." That's his mistake. That's what he is saying he was mistaken about.

The trial judge decided to ask Captain Williams a question: "You have indicated that you made a mistake. That you believed it was a mistake as to which party we were talking about, not [Martin], but the child." Captain Williams responded that he may have misunderstood the question because several videos were being discussed when he stated that he had a video of Willie Martin's interview. Williams clarified that he did not, nor did he ever, have a recording of Martin's second interview. The trial judge pressed on, asking the officer about his response from the day before: "[b]ut yesterday you interpreted that to believe it was of the child—the interview of the child who did have two interviews." Captain Williams responded again that he had made a mistake and said that

I've never said that I had a video other than the preliminary hearing. I stated in the preliminary hearing in 2018, that I had a video of that interview. I was mistaken during the preliminary hearing that I had a video when I actually did not have a video. I have never had a video of Willie Martin's interview.

The State argued that this was the best explanation that had been given. The State asserted that Captain Williams had explained his prior testimony and any confusion as to whether he was talking about Brooke's or Martin's video was "immaterial because he's admitting that

11

he said, yes, there was [a recording], when, in fact, there was not one and that is the mistake." The defense disagreed, arguing, "[t]hat's the issue. . . . [i]t's the credibility of the witness. He's saying it was a mistake." The trial judge ruled that he was not going any further on the matter, but allowed the defense to make its proffer.[9]

¶17. After the recording of the preliminary hearing was played, the defense proffered testimony from Captain Williams regarding the recording of Martin's second interview:

> Q:  [I]s it your testimony that you thought when I was talking about the second interview I was talking about the Kids Hub recording of [Brooke]?
>
> A:  No.
>
> Q:  It is instead your testimony that you believe you had recorded this interview of Willie Martin, but had not?
>
> A:  I had made a mistake, yes, sir.

Again, the defense asked the trial court to allow the recording of the preliminary hearing to be played before the jury. The State again objected, stating that Captain Williams had "fully explained and can fully explain from questions that, yes, he said 'yes,' but, no, there is not and that was a mistake. There's no need for a recording to come in." The trial judge agreed with the State, stating that there was "no sense in stirring up the mud pie anymore. He's admitted it. . . . You have impeached him on this. He admitted he made a mistake. We're going forward."

---

[9]The preliminary hearing recording was proffered and played into the record.

¶18. The jury was brought in and the defense continued its examination of Captain Williams. Again, Captain Williams testified that he made a mistake at the preliminary hearing and had "said that [he] had recorded [Martin's second interview] and I did not record that interview." He added that he had not disclosed any details of Brooke's statement to Martin; rather, he had told Martin that Brooke's statement was different than his original statement and "[Martin] stated that the girl's statement was true and went on with his statement" without being told the contents of Brooke's statement.

¶19. Both sides rested. The jury found Willis guilty of first degree murder of Tamaneka Alexander, and he was sentenced to imprisonment for life without the possibility of parole. Willis moved for a judgment notwithstanding the verdict or, in the alternative, for a new trial. The motion was denied. Willis appealed.

## DISCUSSION

¶20. Willis raises three issues on appeal: 1) whether he was denied his constitutional right to confront the lead investigator, Captain Williams, 2) whether the trial court erred by denying him a self defense jury instruction, and 3) whether the State presented insufficient evidence to support his conviction.

I. **The trial court violated Willis's constitutional right to confront Captain Williams; however, the error was harmless.**

¶21. "Constitutional issues are reviewed de novo." *Jenkins v. State*, 102 So. 3d 1063, 1065 (Miss. 2012) (citing *Smith v. State*, 25 So. 3d 264, 269 (Miss. 2009)).

¶22. Willis argues that "[t]he trial court's limitation of [his] examination of Captain

13

Williams, and the attendant exclusion of extrinsic evidence of the prior inconsistent statement, violated [Willis's] Sixth Amendment right to confront the witnesses against him." Specifically, Willis argues that the trial court prevented him from "fully confronting" Captain Williams about the inconsistencies in his testimony and that he was prejudiced by the trial court's exclusion of extrinsic evidence of Captain Williams's prior inconsistent statement. According to Willis, "[his] ability to confront Captain Williams about the inconsistency was vital to his defense, as it directly influenced the credibility of both Williams and Willie Martin in the eyes of the jury." In its appellate brief, the State argues that "Willis failed to object to the exclusion of the extrinsic evidence as a Confrontation Clause violation, so any objection on that ground is waived."

¶23.    This Court has held consistently that "[c]ounsel must object contemporaneously to inadmissible evidence in order to preserve the error for appeal." ***Ronk v. State***, 172 So. 3d 1112, 1134 (Miss. 2015) (internal quotation marks omitted) (quoting ***Boyd v. State***, 977 So. 2d 329, 337) (Miss. 2008)). "If no contemporaneous objection is made, the error, if any, is waived." ***Id.*** (internal quotation mark omitted) (quoting ***Cole v. State***, 525 So. 2d 365, 369 (Miss. 1987)). This Court has "consistently applied the procedural bar to Confrontation Clause claims when the issue was not raised at trial." ***Id.*** (citing ***Galloway v. State***, 122 So. 3d 614, 661 (Miss. 2013); ***Rogers v. State***, 928 So. 2d 831, 838 (Miss. 2006)). In ***Rogers***, this Court found that the defendant's Confrontation Clause argument was procedurally barred because the record did not show that Rogers had raised a proper objection at trial and "the

14

record contain[ed] no reference to any alleged violation of any right to confrontation or for the trial court to make a ruling regarding the confrontation clause." ***Rogers***, 928 So. 2d at 838. But this case is different.

¶24.     While Willis's attorney never stated explicitly the words, "I object on the grounds of the Confrontation Clause," it is clear from the record that during the trial, counsel for Willis attempted persistently to confront Captain Williams with the recording of his prior inconsistent statement given at an earlier hearing. This Court has recognized that "it would be vain and foolish to demand that in the heated flow of trial, where the grounds of the objection are reasonably apparent from the context, that counsel state his grounds or waive his objection." ***Murphy v. State***, 453 So. 2d 1290, 1293 (Miss. 1984). Additionally, the State acknowledged at oral argument that Willis had preserved his Confrontation Clause objection through his post-trial motion. *See **Goff v. State***, 14 So. 3d 625, 650-51 (Miss. 2009) ("The rule governing preservation for review provides that if an appellant raises for review an issue not raised in the pleadings, transcript, or rulings, the appellant must have preserved the issue by raising it in a motion for a new trial. The rationale for this rule is based on the policy of giving the trial judge, prior to appellate review, the opportunity to consider the alleged error." (citations omitted)). Therefore, we find that Willis did not waive his Confrontation Clause claim.

¶25.     Willis argues that his constitutional right to confront Captain Williams was violated because he was not able to cross examine him fully, owing to the trial judge's not having

15

allowed the jury to hear the recording of Captain Williams's prior testimony. Willis maintains that this limitation prejudiced his defense because he was not able to provide the entire story to the jury regarding his case, which could have influenced the way the jury viewed the credibility of two State's witnesses, Captain Williams and Martin.

¶26. Both our federal and state constitutions protect one's right to confront the witnesses against him or her. U.S. Const. amend. VI; Miss. Const. art. 3, § 26. "The Confrontation Clause confers a right to confront 'those who "bear testimony"' against the defendant." *Conners v. State*, 92 So. 3d 676, 683 (Miss. 2012) (quoting *Crawford v. Washington*, 541 U.S. 36, 51, 124 S. Ct. 1354, 1364, 158 L. Ed. 2d 177 (2004)). "The right of confrontation extends to and includes the right to fully cross-examine the witness on every material point relating to the issue to be determined that would have a bearing on the credibility of the witness and the weight and worth of his testimony." *Ambrose v. State*, 254 So. 3d 77, 100 (Miss. 2018) (internal quotation marks omitted) (quoting *Young v. State*, 731 So. 2d 1145, 1151 (Miss. 1999)).

¶27. Initially, the trial court was going to permit Willis to proceed with the playing of the recording after its perjury investigation. But the State raised a question of whether the playing of the recording was necessary due to the fact that Captain Williams already had admitted, under oath, that he had made a mistake at the preliminary hearing and that he did not record Martin's second interview. The trial court reconsidered and granted the State's objection to the admission of the recording into evidence. The trial court reasoned that the

16

recording from the preliminary hearing should not be admitted and played for the jury

because Captain Williams had admitted that he had made a mistake and because the

recording would not provide the jury any additional information, except to "stir[] up the mud

pie[.]" By the court's not having allowed the jury to hear the recording, Willis's attorney was

precluded from conducting an in-depth cross examination, which denied Willis his right to

cross examine fully one of the State's witnesses against him.

¶28.    Mississippi Rule of Evidence 613(b) authorizes the admission of extrinsic evidence

of a witness's prior inconsistent statement. MRE 613(b); *see also **Portis v. State***, 245 So. 3d

457, 471 (Miss. 2018). In ***Portis***, the Court clarified Rule 613(b) and stated that "no outright

ban on admitting extrinsic evidence of prior inconsistent statements exists, but, rather, the

admission is committed to the sound discretion of the trial court, as outlined by the Fifth

Circuit's standards[.]" ***Portis***, 245 So. 3d at 471. The ***Portis*** Court looked to a United States

Court of Appeals for the Fifth Circuit case, ***United States v. Meza***, 701 F.3d 411 (5th Cir.

2012), for guidance in prescribing steps for trial courts to consider when deciding whether

to admit extrinsic evidence of an admitted prior inconsistent statement:

> First, the court must examine whether the statement offered is inconsistent or
> consistent. In doing so, an unequivocal or obliging admission of the prior
> statement may, if offered, render the trial testimony consistent with the prior
> statement, taking the prior statement out of the purview of Rule 613(b). We
> also caution courts to avoid confusing an explanation with an unequivocal or
> obliging admission.[10] . . . Second, if the statement is inconsistent, even in a

---

[10]The ***Meza*** court contrasted the differences between "unequivocal or obliging admission" and "explanation," stating that "explanations and denials run the gamut of

17

negligible way, the extrinsic evidence of the statement must still pass through Rule 403, the interests of justice catchall in Rule 613(b), and the multitude of court cases providing for when and how impeachment evidence must be treated before extrinsic evidence of the statement could be admitted into evidence. *See, e.g.*, **Flowers v. State**, 773 So. 2d 309 (Miss. 2000) (a foundation regarding the statement must be laid; counsel must have a good-faith basis for the questions asked on cross-examination and therefore "may not use prior inconsistent statements as a 'guise of impeachment for the *primary* purpose of placing before the jury substantive evidence which is not otherwise admissible.'").

*Portis*, 245 So. 3d at 471. Willis argues that "Captain Williams's acknowledgment of his prior inconsistent statement was far from 'an unequivocal or obliging admission'" because Captain Williams had given multiple, contradictory explanations, which impacted his credibility. Willis maintains also that he was prejudiced, which "stems from the significance of Willie Martin's second statement—and the circumstance that led to that statement" because Martin's second statement exists as a direct result of his interactions with Captain Williams. In its appellate brief, the State says that it would not categorize Captain Williams's initial impeachment statements as unequivocal. We find that Captain Williams made four different statements regarding his prior inconsistent statement, thereby rendering them inconsistent.

¶29. The State argues that admitting the recording of the preliminary hearing would have been cumulative because the defense did impeach Captain Williams regarding his prior

---

human ingenuity, ranging from a flat denial, to an admitted excuse, to a slant, to a disputed explanation, or to a convincing explanation. Whether flatly denied or convincingly explained, the inconsistency can stay inconsistent." *Portis*, 245 So. 3d at 470 (internal quotation marks omitted) (quoting *Meza*, 701 F.3d at 426).

18

inconsistent statement and because the jury already had heard him admit under oath that he had made a mistake. This Court has recognized that "Rule 403 is an ultimate filter through which all otherwise admissible evidence must pass." *Jones v. State*, 920 So. 2d 465, 475 (Miss. 2006) (quoting *Hoops v. State*, 681 So. 2d 521, 530-31 (Miss. 1996), *abrogated on other grounds by Willis v. State*, 300 So. 3d 999 (Miss. 2020)). We find the recording of the preliminary hearing is relevant evidence that is corroborating and confirming, rather than cumulative.

¶30. We disagree that the recording would have confused the jury. The recording verifies, explains, and provides context to the jury, rather than repeating facts already known to the jury. The jury should have been allowed to compare and evaluate for themselves Captain Williams's trial testimony with his testimony given at the preliminary hearing. By not allowing the recording to be admitted, the trial judge cut off the jury's ability to assess Captain Williams's testimony fully. For example, the jury was not allowed to decide whether that mistake was intentional or unintentional. Was the mistake deliberate, or was it accidental? This Court has held many times such matters are within the sole province of the jury, as the "[t]he jury is the judge of the weight of the evidence and the credibility of the witnesses." *Upchurch ex rel. Upchurch v. Rotenberry*, 761 So. 2d 199, 205 (Miss. 2000) (citing *Jackson v. Griffin*, 390 So. 2d 287, 289 (Miss. 1980)). We find that the jury should have heard the recording of the preliminary hearing because it was relevant to what had motivated Captain Williams to admit his mistake. Instead, the trial judge evaluated

19

Williams's veracity and his credibility, thus invading the province of the jury. Therefore, we find that a Confrontation Clause violation occurred.

¶31.    While we do find that a Confrontation Clause violation occurred in this case, we also must determine whether that violation was harmless. "This Court has recognized that Confrontation-Clause violations are subject to harmless-error analysis." *Conners*, 92 So. 3d at 684 (citing *Corbin v. State*, 74 So. 3d 333, 338 (Miss. 2011)). "The well-settled standard for determining whether a constitutional error is harmless is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Ambrose*, 254 So. 3d at 105 (internal quotation mark omitted) (quoting *Gillett v. State*, 148 So. 3d 260, 266 (Miss. 2014)). Additionally, "[e]ven errors involving a violation of an accused's constitutional rights may be deemed harmless beyond a reasonable doubt where the weight of the evidence against the accused is overwhelming." *Id.* at 105 (internal quotation marks omitted) (quoting *Clark v. State*, 891 So. 2d 136, 142 (Miss. 2004)). "[A]n otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Conners*, 92 So. 3d at 684 (alteration in original) (internal quotation marks omitted) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S. Ct. 1431, 1436, 89 L. Ed. 2d 674 (1986)). This Court previously has explained that:

> The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily

20

accessible to reviewing courts. These factors include the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Ambrose*, 254 So. 3d at 105 (alteration in original) (quoting *Clark*, 891 So.2d at 142)).

¶32. Willis contends that the violation tainted Williams's credibility. He complains also that the violation tainted Martin's testimony and credibility because Captain Williams's prior inconsistent statement concerned the circumstances surrounding Martin's second statement, which incriminated Willis. Captain Williams was the lead investigator in this case. He explained the evolution of Martin's statements. Martin's testimony, on the whole, was damaging to Willis. Willis was allowed to cross examine Captain Williams fully concerning all relevant matters except the recording of the preliminary hearing.

¶33. Even without the testimony of Captain Williams or Martin, a reasonable juror could have concluded from the remaining evidence presented by the State, particularly Brooke's testimony, that Willis shot and killed Tamaneka Alexander without justification or excuse.

¶34. The testimony of Brooke, the minor daughter of Tamaneka Alexander who told the jury all that she had seen and heard the night her mother was shot to death, was devastating to Willis. A reasonable and objective jury could have convicted him on her testimony alone.

¶35. The text messages between Willis and Tamaneka Alexander were admitted into evidence. A reasonable juror could infer from those text messages that Willis had the requisite intent to murder Tamaneka Alexander.

21

¶36. Had the State rested after the testimony of Brooke and its presentation of the text messages, a conviction would have been almost certain. The State adduced the testimony of Lori Beall also, an expert in firearms identification from the Mississippi Forensics Laboratory. Beall testified that both Tamaneka Alexander and Willis were shot with a .22 caliber Heritage Rough Rider revolver, which was found in the yard in close proximity to Willis.

¶37. While Captain Williams's testimony helped the jury understand how the investigation was conducted, his testimony was not indispensable to Willis's conviction and was not nearly as important as that given by Brooke and the text messages. *See Clark*, 891 So. 2d at 142. Thus, we find that the Confrontation Clause violation was harmless error. The State presented ample evidence that established Willis's guilt beyond a reasonable doubt.

## II. The trial court did not abuse its discretion by denying Willis's self-defense jury instruction.

¶38. Willis contends that because the record supports his theory of self-defense, the trial court abused its discretion by denying his self-defense jury instruction.[11] "We review the denial or acceptance of a proposed jury instruction for abuse of discretion." *Gilmore v. State*,

---

[11]The State claims that Willis waived his request for a self-defense jury instruction because at the jury instruction conference, "Willis's counsel took the position that the evidence supported only a first-degree murder instruction and an accident instruction—nothing more." But this Court has held that "[a] criminal defendant has a right to assert alternative theories of defense, even inconsistent alternative theories." *Reddix v. State*, 731 So. 2d 591, 593 (Miss. 1999) (citing *Love v. State*, 441 So. 2d 1353, 1356 (Miss. 1983)).

22

119 So. 3d 278, 287 (Miss. 2013) (citing *Maye v. State*, 49 So. 3d 1124, 1129 (Miss. 2010)).

"'[A] defendant is entitled to have jury instructions given which present his theory of the case,' but 'the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.'" *Id.* (quoting *Newell v. State,* 49 So. 3d 66, 74 (Miss. 2010)). This Court has said

> "Self-defense is codified at Mississippi Code Section 97-3-15(f), which provides that the killing of a human being is justified '[w]hen committed in the lawful defense of one's own person or any other human being, where there shall be reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design['s] being accomplished.'"

*Nelson v. State*, 284 So. 3d 711, 716 (Miss. 2019) (first alteration in original) (quoting *Brown v. State*, 222 So. 3d 302, 307 (Miss. 2017)). "[T]he actor's apprehension must be objectively reasonable before his homicide is justified." *Id.* (internal quotation marks omitted) (quoting *Brown*, 222 So. 3d at 307). This Court has held that "[i]n homicide cases, the trial court should instruct the jury about a defendant's theories of defense, justification, or excuse that are supported by the evidence, no matter how meager or unlikely." *Id.* at 718 (internal quotation marks omitted) (quoting *Brown v. State*, 39 So. 3d 890, 899 (Miss. 2010)). Willis maintains that there were "several pieces of evidence [that] supported the theory that Willis may have acted in self-defense." He claims that the records contains:

- Martin's initial statement, which shows Willis and Tamaneka Alexander were in an altercation and Willis came "running out with a gun[;]" Martin was "not sure if [Willis] was being chased by someone with a weapon or not."

23

- Police found a gun in the back bedroom.

- In Brooke's Kids Hub interview, she stated that she heard Willis and Tamaneka Alexander pushing.

- Crime scene photographs were admitted into evidence, and they showed that the living room was in a mess, which could be indicative of an altercation.

- The medical examiner testified that "it [was] possible [Tamaneka Alexander] had her hands on the gun when it was fired[,]" which could lead one to believe "the couple struggled over the weapon."

- Lastly, Willis was shot in the abdomen.

¶39. But the State presented credible evidence that contradicted each of these assertions. At trial, Brooke denied hearing any pushing between the defendant and the victim. Also, Captain Williams testified that the crime scene did not show signs of an altercation. The State's firearms expert testified that the weapon with which both Willis and Tamaneka Alexander were shot was the .22 caliber Heritage Rough Rider revolver found outside, in close proximity to Willis. Brooke testified that she heard the second gunshot come from outside, not inside, the house and it was after her mother had been shot. Based on Brooke's testimony, a rational juror could infer that Willis was wounded after Tamaneka Alexander had been shot and not during a struggle.

¶40. This Court has stated that

Self defense is a legal concept which must be supported by evidence to be available to a defendant in a homicide case. The mere statement by a defendant that he killed his victim in "self-defense" is wholly incapable by itself of raising a factual question requiring its submission to the jury. The plea of self-defense must be supported by evidence of facts and circumstances from

24

which the jury may conclude that a defendant was justified in having committed the homicide because he was, or had reasonable grounds to believe that he was, in imminent danger of suffering death or great bodily harm at the hands of the person killed.

*Strong v. State*, 600 So. 2d 199, 203 (Miss. 1992) (quoting *Wadford v. State*, 385 So. 2d 951, 955 (Miss. 1980)). Nothing in the record supports Willis's theory that he was in imminent danger of suffering some great personal injury or death at the hands of Tamaneka Alexander. The trial judge recognized this and denied the instruction. Therefore, this Court finds that the trial court did not abuse its discretion by denying the jury instruction.

### III. The State presented sufficient evidence to support the jury's verdict.

¶41. Willis argues that the State failed to provide sufficient evidence to support his conviction. When reviewing "whether the evidence is sufficient to sustain a conviction, this Court employs a *de novo* standard of review." *Green v. State*, 269 So. 3d 75, 79 (Miss. 2018) (citing *Brooks v. State*, 203 So. 3d 1134, 1137 (Miss. 2016)). This Court has held that:

> "The relevant question is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Hearn v. State*, 3 So. 3d 722, 740 (Miss. 2008) (quoting *Bush v. State*, 895 So. 2d 836, 843 (Miss. 2005), *abrogated on other grounds by Little v. State*, 233 So. 3d 288, 289 (Miss. 2017)). "Under this inquiry, all evidence supporting the guilty verdict is accepted as true, and the State must be given the benefit of all reasonable inferences that can be drawn from the evidence." *Galloway v. State*, 122 So. 3d 614, 665 (Miss. 2013). Appellate courts "should reverse only where, with respect to one or more elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty." *Boyd v. State*, 977 So. 2d 329, 337 (Miss. 2008) (citation omitted) (internal quotations omitted).

*Id.* Willis was convicted of first degree murder under Mississippi Code Section

25

97-3-19(1)(a). "Therefore, the prosecution is required to prove beyond a reasonable doubt that: '(1) the defendant killed the victim; (2) without authority of law; (3) with deliberate design to effect [her] death.'" ***Johnson v. State***, 224 So. 3d 66, 68 (Miss. 2016) (quoting ***Brown v. State***, 965 So. 2d 1023, 1030 (Miss. 2007)).

¶42.    Willis asserts that the State failed to prove that he caused Tamaneka Alexander's death. He claims that there was no eyewitness testimony or physical evidence presented to the jury regarding who actually shot Tamaneka Alexander. He relies on the medical examiner's testimony, in which she stated that it was possible for Tamaneka Alexander to have had her hands on the gun prior to the shooting. But the State presented the testimony of both Martin and Brooke. Martin testified that he observed Willis and Tamaneka Alexander arguing and then heard a gunshot. Brooke testified that she heard Willis "bust up in the house fussing[,]" people running, a gunshot, and then she heard someone fall. She testified also that when she went to see who had fallen, she saw Willis standing over her mother's wounded body, pointing a gun, and fussing. The State contends that "Martin and Brooke's testimonies are sufficient evidence for the jury to reasonably conclude that Willis was responsible for [Tamaneka] Alexander's death." Viewing the evidence in the State's favor, we agree.

¶43.    Next, Willis claims that the State "failed to prove that the shooting was done without the authority of law," but instead, he posits, the evidence indicates that the killing was the result of either an accident or self-defense. Willis maintains that there was evidence of a struggle. But no evidence in the record supports this assertion.

26

¶44. The State adduced sufficient evidence that Willis acted with deliberate design by admitting the text messages between Willis and Tamaneka Alexander. In those messages, Willis informed Tamaneka Alexander that "someone bout to die tonight," "tonight [you] in trouble," and "you going to see who I can be now." This Court has held that "[d]eliberate design to kill a person may be formed very quickly, and perhaps only moments before the act of consummating the intent." *Holliman v. State*, 178 So. 3d 689, 698 (Miss. 2015) (internal quotation marks omitted) (quoting *Jones v. State*, 154 So. 3d 872, 880 (Miss. 2014)).

¶45. Viewing the evidence in the light most favorable to the State, a rational juror could have found that all of the essential elements of first degree murder were present. This Court finds that substantial evidence supported Willis's conviction.

## CONCLUSION

¶46. Willis's right to cross examine fully and confront Captain Williams was violated. Willis should have been allowed to confront Captain Williams with the recording of his prior inconsistent statement. Although we find that there was a violation of the Confrontation Clause, we find also that this was harmless error. The record does not support the giving of a self-defense jury instruction. Giving the prosecution the benefit of all reasonable inferences, the evidence supports Willis's conviction for first degree murder. We affirm.

¶47. **AFFIRMED.**

**KING, P.J., COLEMAN, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR. BEAM, J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, C.J., AND MAXWELL, J.**

27

**BEAM, JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶48. Respectfully, I find no Confrontation Clause error with the trial court's decision not to allow into evidence the recording of Captain Pete Williams's preliminary-hearing testimony. Error, if any, in this instance would be based upon nonconformity with Rule 613(b) of the Mississippi Rules of Civil Procedure and this Court's clarification of the rule in *Portis v. State*, 245 So. 3d 457, 470 (Miss. 2018).

¶49. The defense was not prevented from examining or cross-examining its witness, Captain Williams, "on every material point" regarding the alleged inconsistency between Captain Williams's preliminary-hearing testimony and trial testimony. *Ambrose v. State*, 254 So. 3d 77, 100 (Miss. 2018) (quoting *Young v. State*, 731 So. 2d 1145, 1151 (Miss. 1999)). Moreover, the defense did not raise a Confrontation Clause claim in the trial court.

¶50. I do not find that the matter merits constitutional concern. Therefore, I concur in part and in result with the majority's opinion.

**RANDOLPH, C.J., AND MAXWELL, J., JOIN THIS OPINION.**